[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. NATURE HISTORY OF PROCEEDINGS
This action in which, for the most part, the plaintiff seeks a judgment ordering specific performance by the named defendant and his spouse, Kathy L. Matyas, pursuant to an alleged agreement by the defendants to sell to the plaintiff real estate owned by the defendants including the single family dwelling currently occupied by the defendants as their residence.
By amended complaint filed December 28, 2000, the plaintiff seeks the remedy of equitable specific performance" (First Count); a court order pursuant to General Statutes § 47-31 (a)[1] settling by decree the dispute between the parties (Second Count)[2]; money damages for defendants' breach of the alleged agreement (Third Count); and an unspecified remedy for conduct on the part of the defendants allegedly motivated by bad faith (Fourth Count).
Defendants in their answer and special defenses filed July 13, 2001, deny that any writing signed by the parties constituted an express contract of sale as material terms were not agreed to; assert that any such writing fails to comply with § 52-550, our Statute of Frauds; claim that any such writing was a binder, not a contract of sale; and challenge the validity of the action to quiet title (Second Count) as the defendants are the owners of the fee interest in the real property which is the subject of the dispute.
Plaintiff's reply to special defenses dated February 4, 2002, and filed just prior to commencement of trial, alleges that the doctrine of part performance removes the disputed document from the provisions of the statute of frauds. Defendants denied the additional assertions made by the plaintiff in said reply.
At the commencement of trial this court denied the defendants' motion to strike, dated February 8, 2002, which was addressed to the plaintiff's CT Page 10558 second and third special defenses, i.e., the plaintiff's allegations claimed by him to establish part performance.
Trial commenced on February 26, 2002, and continued for six days, concluding with arguments by counsel on March 6, 2002. A briefing schedule was ordered as follows: Plaintiff's brief — March 27, 2002, defendants' reply — April 17, 2002, plaintiff's reply April 24, 2002. The court extended the final filing date to April 30, 2002 at which time the matter was submitted to the court for decision.
During the trial, the court heard from six witnesses, to wit, the plaintiff and the defendant Ralph Matyas; a real estate broker and employer of the defendant Kathy Matyas; an unsuccessful bidder on the disputed property and the attorneys who represented each of the parties relative to the closing of the real estate sale which never took place. The court received fifty-two documents as full exhibits.
In reaching its decision, this court has considered the testimony of the witnesses, has assessed the credibility of all witnesses, has read and reviewed all the exhibits and has considered those facts and legal principles raised by counsel in their respective briefs.
II. RELEVANT FACTS
At the outset this court is compelled to point out that it does not deem any party to or witness in this case to be unsophisticated and inexperienced in the area of real estate transactions and procedures. All of the participants are well-educated professionals and are much more knowledgeable about buying and selling real estate than the average person. Although the plaintiff is not a real estate professional, he is an orthodontist who has bought and sold real estate in the past and who certainly impressed the court with his intelligence and knowledge as to the structural and aesthetic components of a dwelling unit. The defendant Kathy has been a real estate agent for twelve years and is certainly familiar with real estate practice and procedure in Litchfield County. Her husband, the named defendant, is a licensed renovation contractor who builds and remodels houses. Attorney Peter Litwin, who, as to the buy-sell aspect of this transaction, represented the plaintiff and Attorney Brian McCormick who represented the defendants, each have had a successful real estate practice in Litchfleld County for many years. Attorney Tom Witherspoon, the unsuccessful bidder on the disputed real property, has also practiced law for years in Litchfield County. Edward J. "Ted" Murphy owns his own real estate business which employs the defendant Kathy, and has over twenty years of experience as a licensed broker and agent in Litchfield County. This court, throughout the trial, was and continues to be amazed as to how, given all the experience and CT Page 10559 expertise on both sides of this transaction, the parties got themselves into this unfortunate, expensive and protracted litigious relationship. The insertion of an appropriate word or phrase at the appropriate time would have easily averted the debacle that has resulted from this transaction. Be that as it may, nonetheless, the responsibility now falls on this court to attempt to sort out the facts and resolve the matter consistent with established principles of law.
From January to August, 1999, at the plaintiff's request, his friend Ted Murphy, whom the plaintiff has used as a broker in past real estate dealings, was on the lookout for a single family residence in Litchfield for the plaintiff and his fiancee. Murphy showed the plaintiff over a dozen houses up to August, 1999 but none was deemed suitable to the plaintiff however, Murphy suggested to the plaintiff that a sales agent employed by him, the defendant Kathy, owned an unfinished home in which she and her husband were residing, which said defendants might agree to sell. Murphy then mentioned the sale prospect to the defendant Kathy who told Murphy that the house was not for sale. When Murphy communicated his employee's reluctance to show her house to the plaintiff, who was determined to see the house, the plaintiff urged his friend to persuade the defendant Kathy to allow him to inspect the house. Murphy, at the plaintiff's prompting, approached the defendant Kathy on at least three or four occasions until she agreed to a compromise to allow the plaintiff to view the exterior only. Thus, in early August, 1999, the plaintiff did so and, as a result of seeing the exterior of the premises, became even more enamored of the house. Plaintiff then asked Murphy to convince his employee to allow an interior inspection. Again, the defendant Kathy rebuffed these requests by her boss, but finally agreed to the interior inspection desired by the plaintiff.
The interior inspection by the plaintiff took place near the end of September or early October, 1999, and resulted in discussions anticipating a possible purchase. As significant work needed to be done to the dwelling to obtain a certificate of occupancy, the plaintiff and the defendant Ralph discussed the possibility of Ralph Matyas d/b/a Abilities Unlimited[3] performing the work. The work remaining consisted of trim, some flooring, cabinets, columns on the porch, and the selection and installation of an elaborate spiral staircase. Also discussed was the intention of the defendants to place a conservation easement on the lower lot of the real estate in favor of the Litchfield Land Trust. Since the intention to do so was motivated by income tax considerations, any closing of any sale that might be negotiated would have to be delayed for several months due to holding period requirements. Several weeks later the parties again met at the defendants' home to further discuss the matter. At this point in the relationship, discussions, including price and required improvements, CT Page 10560 were general in nature with no commitment by the defendants' to sell and no commitment by the plaintiff to buy, although the plaintiff's interest in acquiring the dwelling was reaching a fever pitch. At this time, the plaintiff and the defendant Ralph met with a representative of New England Stair Co. which was recommended by said defendant as a source for the staircase. While discussions remained on a preliminary level, the plaintiff and the defendant Ralph communicated by telephone on the issue of the improvements.
On Friday, October 22, 1999, the circumstances relative to a possible sale of the defendants' house changed dramatically. Attorney Tom Witherspoon had gotten word of the possibility of the defendants selling their house, had previous knowledge of the property and asked to inspect it. The defendants allowed Attorney Witherspoon and his spouse to see the premises on three occasions on one day which resulted in an oral offer to purchase. At that point, the defendants were still unsure whether they wished to sell. The defendant Kathy contacted Murphy to discuss the matter prior to leaving for a planned weekend trip who advised her that she owed the plaintiff an opportunity to make an offer. At that time the defendants, who solicited no one as a prospective purchaser and who had not yet decided to list the premises for sale, were in a quandary. On the one hand, was the plaintiff who was very interested in the purchase and who had been brought into the situation by the defendant Kathy's boss who ordinarily would be entitled to some commission. On the other hand, were the Witherspoons who were very excited over the prospect of owning the premises and had made a very lucrative offer and were pressuring the defendants to promptly accept the offer and to sign a contract of sale; no commission would be due on the Witherspoon deal.
When the defendant Kathy went to work on Monday, October 25, 1999, Murphy testified that she was as upset as he had ever seen her. Neither of the defendants had reached a decision to sell their house, yet two prospective buyers, who were friends with each other, were very interested in acquiring the property. Murphy suggested, and the defendants agreed, that the only fair thing was to allow bids from each of the prospective purchasers. Murphy offered to seek no commission in the event that the plaintiff was the successful bidder. The defendants acquiesced and it was decided that bidding would close at 5:00 p.m. on the next day.
Murphy met with the plaintiff the next morning and, knowing the sum offered orally by the Witherspoons, prepared an offer to purchase (Plaintiff's Exhibit #3) which contained several errors, including the misspelling of the defendants' name; a misidentification of the street on which the property was located; a lack of a description, by lot number, and by number of parcels to be included in the sale; and a misalignment of the numerical sums to be paid. This hastily prepared offer, however, CT Page 10561 did contain a property address (103 Camp Dutton Hill Road, Litchfield, Connecticut), a purchase price ($701,000) and a deposit amount ($70,100). The offer was subject to no mortgage contingency and the plaintiff was agreeing to accept the property as is in that he was expressing satisfaction with its physical condition and was not relying on any representations of the defendants. The offer made it clear that neither seller nor purchaser were represented by a broker.
The offer, however, was subject to two distinct and separate contingencies. The first involves the closing date and is the one clause in this document which, more than any other, is the center of this litigation. That clause is entitled "CLOSING" and reads as follows:
 "The transfer of title to the property to the Purchaser shall take place on or before TO BE MUTUALLY AGREED UPON BY BUYER (AND) SELLER."
The other controversial clause reads, under the heading "OTHER CONDITIONS, IF ANY", as follows:
 "SUBJECT TO AN EASEMENT IN FAVOR OF THE LITCHFIELD LAND TRUST ON THE LOWER LOT LOCATED JUST WEST AND CONTIGUOUS TO THE HOUSE LOT."
The document also contained the following language:
 BINDING EFFECT: This agreement is a binding and enforceable legal contract and shall be binding upon and will be to the benefit of the parties and their respective executors, administrators, heirs, successors and assigns.
By previous arrangement, the plaintiff's offer was submitted to Attorney McCormick, as was that of the Witherspoons, prior to 5:00 p.m. on October 26, 1999. The Witherspoons' offer did provide for an ultimate closing date of July 1, 2000. As noted, the plaintiff's offer provided for no definite closing date. During the meeting at the Murphy Agency on October 25, the defendants informed Murphy that they needed to find an appropriate home to which to relocate prior to any closing of a sale of their home. With this knowledge, Murphy prepared the plaintiff's offer.
On November 2, 1999, the defendants executed the document comprising the plaintiff's offer. The document is entitled "Litchfield County Board of Realtors, Inc. . . . Agreement To Sell and Purchase Real Estate". (See Plaintiff's Exhibit #4). The only correction made by the defendants was to refigure and realign the balance due. The correction did not alter the purchase price or the amount deposited, payment of which was CT Page 10562 acknowledged. The correction was initialed by the defendants, but was not initialed by the plaintiff. A "Residential Property Condition Disclosure Report" accompanied the "Agreement"[4] (See Plaintiff's Exhibit #5) which was signed by the defendants on October 25 and by the plaintiff on October 26. It provided, inter alia, that certain items were not completed and that a "land trust" easement would be placed on "Lot #4 prior to closing". The document, executed by defendants one day prior to the preparation of the plaintiff's offer, listed as the property address "103 Camp Dutton Road, Litchfield."
Two days after the plaintiff's offer and deposit were accepted by the defendants, while the planned improvements were still in the discussion stage, the plaintiff presented the defendant Ralph with a check in the amount of $1500 which, although initially declined by said defendant, was left on the table by the plaintiff. The check was returned a month later by said defendant to the plaintiff after the defendant wrote "VOID" across the front of the check. (See Plaintiff's Exhibit #6.) Within six days of the defendants' acceptance of the plaintiff's offer, the plaintiff requested a closing date of February 1, 2000. In his letter transmitting that request (Plaintiff's Exhibit #14), the plaintiff offered to "arrange a rental agreement" so that the defendants could remain at their residence while they attempt to locate and acquire another suitable residence. This document certainly establishes that the plaintiff knew, very early into the contractual relationship, that the defendants needed to find alternative housing. The date of February 1 was unacceptable to the defendants. Plaintiff continued to aggressively press Attorney Litwin to arrange through Attorney McCormick a definite closing date. Based upon a representation by the plaintiff that the defendant Ralph had agreed to a May 1, 2000 closing date which was communicated to Attorney McCormick by Attorney Litwin in mid December, 1999, Attorney McCormick prepared a proposed "Addendum" to the aforementioned "Agreement" (Plaintiff's Exhibit #40), which was signed by the plaintiff. The "addendum" provided for a closing "on or before May 1, 2000, provided that the plaintiff's deposit be retained in an interest-bearing account, provided for the return of the improvement deposit of $1,400"[5] and provided for payment of any improvements made by the defendants at closing. The "Addendum" was not signed by the defendants who found the May 1st date unacceptable as they had not as yet found suitable alternative housing although they were diligently pursuing that goal.
By mid March, 2000, the plaintiff had decided to use the services of the contractor recommend by the defendant Ralph for the purchase and installation of the spiral staircase. The total price for the materials and labor was $15,000, payable via a 50 percent deposit with the balance due on completion. (See Plaintiff's Exhibit #45.) There was no evidence CT Page 10563 offered at trial that the plaintiff paid any sums to anyone in this regard.
By April 1, no closing date had been agreed to prompting the plaintiff to again push Attorney Litwin to negotiate a date no later than July 1 (Plaintiff's Exhibit #36.) Two days later, the plaintiff telephoned Attorney Litwin and requested that he prepare a "hold harmless Agreement" as the defendant Ralph had agreed to allow the plaintiff to store some furniture in the work shop portion of defendants' house. (Defendants' Exhibit #34.) Plaintiff had sold his condominium and moved in with his fiancee and needed a place to store two rooms of furniture. Attorney Litwin prepared a document which he titled "Rental Agreement" (Plaintiff's Exhibit #8) which, although not providing for the payment of any rent by the plaintiff, did provide for the storage of the plaintiff's furniture "pre-closing." There was also an insurance and indemnification obligation undertaken by the plaintiff — clauses typical of a hold-harmless agreement. The agreement was signed by the defendants on April 7 who received it via fax from Attorney McCormick. The fax cover sheet pointed out "It does not include a closing date." (Defendants' Exhibit #13.)
Three days after the defendants executed the rental agreement, Attorney Litwin, by letter, prevailed on Attorney McCormick, once again, to persuade the defendants to agree to a definite closing date. (Plaintiff's Exhibit #37.) Neither of the attorneys took any actions to prepare for a May 1 closing date. On April 25, 2000, however, the named defendant, at plaintiff's request, faxed to the plaintiff the latest tax assessments on Lot #3 (the house lot) and Lot #4 (the lower lot). (Plaintiff's Exhibit #44.) By May 22, 2000, the plaintiff's frustration over the delay in closing the sale had reached its peak. On that date the plaintiff, again, wrote to Attorney Litwin requesting that he set up a meeting between the parties. (Plaintiff's Exhibit #31). Attorney Litwin then wrote to Attorney McCormick requesting "a four-way conference" who then forwarded the request to the defendants. The defendants in their response (Defendants' Exhibit #19) asserted that the plaintiff was well aware that there would be no closing date agreed to until they, the defendants, found suitable housing. That was the reason, according to the defendants, for the language in the "Agreement" referring to a mutually agreeable closing date. The defendants advised Attorney McCormick that if plaintiff's frustration "has become unbearable," they would release him from any obligation to purchase. When Attorney Litwin informed the Plaintiff of defendants' response, the plaintiff wrote to Attorney Litwin (Defendants' Exhibit #21) on May 31, 2000, suggesting a closing date "for the fall" and communicating an offer by the plaintiff's fiancee of the rental of her four bedroom house until the defendants found suitable permanent housing. Plaintiff concluded "one way or another a closing date CT Page 10564 must be established". Upon receipt of the plaintiff's letter by fax, Attorney Litwin wrote Attorney McCormick on June 5, 2000, suggesting a September or October closing date. (Plaintiff's Exhibit #28.) In said letter Attorney Litwin stated that unless a definite date was agreed to, the plaintiff would be compelled to seek a "judicial determination of his contract rights." Attorney Litwin indicated that this was his and the plaintiff's "final effort" to resolve the matter.
Nine days after Attorney Litwin's June 5 letter, another attorney retained by the plaintiff, attorney Timothy Brignole, who was trial counsel, wrote to the defendants. (Plaintiff's Exhibit #27.) Attorney Brignole alleged that closing dates had been agreed to for May 1 and July 17, 2000 and informed the defendants that the July 17 date would not be extended. The letter also stated that the plaintiff had obtained the necessary financing to complete the transaction and that Attorney Brignole was "retained for the express purpose of the enforcement of this contract." The letter concluded with the warning that a failure of the defendants to close on or before July 17, 2000, would result in litigation. The reaction of the defendants to Attorney Brignole's letter was, like the plaintiff, to retain another attorney, William Franklin, who was trial counsel for the defendants. In his letter dated June 19, 2000 (Plaintiff's Exhibit #26), Attorney Franklin claimed that the document entitled "Agreement to Sell and Purchase Real Estate" was not a contract, but was merely "a preliminary binder" which, lacking a closing date and containing ambiguous terms, including the property description, was volative of the requirements of the statute of frauds. The letter announced the intention of the defendants to have no further dealings with the plaintiff in light of plaintiff's threat of litigation. In addition, Attorney Franklin demanded that the plaintiff, upon forty-eight hours notice, remove his stored furniture from the defendants' premises. One week after Attorney Franklin letter, at the direction of the defendants, Attorney McCormick returned to the plaintiff his $70,100 deposit plus interest in the amount of $1,675.62. (Plaintiff's Exhibits #24 and #25.) Plaintiff initiated the present action shortly thereafter.
Prior to addressing the claims of the parties, it is noteworthy to mention two professional conflicts of interest which were prevalent throughout this case — the first involving Mr. Murphy and the second involving Attorney Litwin.
As indicated, Mr. Murphy was the defendant Kathy's boss for twelve years. Mr. Murphy was also a friend of the plaintiff and was engaged in a professional capacity in the process of locating a new home for the plaintiff while marketing the plaintiff's condominium dwelling unit for sale. Until the discussions that took place in Murphy's office on October 25, 1999, Murphy fully intended to collect some commission in the event CT Page 10565 of a sale of the defendants' dwelling to the plaintiff. Whether Murphy was acting in this manner as a friend and the "agent" of the plaintiff or whether he was acting as a boss or "agent" of the defendants is immaterial. Whether he was motivated by friendship or profit is not the issue. The fact of the matter is that he was the catalyst that brought about this transaction between an overly aggressive buyer and two reluctant sellers. He was the author of the document which has spawned this litigation. He was the one who suggested the bidding procedure between the plaintiff and the Witherspoons — a procedure tainted by Murphy's knowledge of the amount and terms of the Witherspoons' bid. Finally, he is the one who, having told the defendant Kathy that he would not be claiming a commission and having confirmed the same by inserting "NO BROKER" into plaintiff's offer, nonetheless, prepared an offer which exceeded the Witherspoon offer, not by $100 or even $1,000, but by $21,000 which would most certainly neutralize a reluctant seller. When asked, given that reluctance, why he accepted the plaintiff's offer, the named defendant responded, "It was for more money!" Furthermore, the testimony clearly shows that Murphy knew full well that the defendants would not agree to a closing date until they found an alternative dwelling. The testimony further showed that the plaintiff was eager to move into the dwelling and the sooner the better. Despite having knowledge of these conflicting attitudes about the closing of this transaction, Murphy opted to insert the phrase in the plaintiff's offer which has resulted in this litigation. Whatever his motivation, Murphy should have never immersed himself into this transaction.
Attorney Litwin's conflicted professional relationship consists in the fact that at the time he agreed to represent the plaintiff in the closing of the purchase of the dwelling owned by the defendants, he was representing the defendants, who had retained him several months earlier, relative to the negotiation and preparation of a conservation easement with the Litchfield Land Trust. This is the very same easement, "on the lower lot," the execution of which was made a condition precedent in the parties "Agreement." Thus, at the same time he is professionally obligated to the plaintiff as the purchaser to bring about the earliest possible closing of this transaction, he is likewise obligated to the defendants as sellers to diligently pursue the negotiation, drafting, execution and recording of an easement without which no closing would take place. As the court has earlier noted, the plaintiff was aggressively pursuing an early closing date while the defendants were refusing to agree to a closing without having found a suitable housing alternative, yet each were represented by the same attorney. Attorney Litwin should not have immersed himself into this conflicted relationship or, in any event, once having realized the differing attitudes and emerging adversity between the plaintiff and the defendants, should have terminated the lawyer-client relationship with either or both. CT Page 10566
III. DISCUSSION OF THE ISSUES:
A. Binder v. Contract
Plaintiff insists that the "Agreement" executed by and between the parties in this case relative to the sale of the defendants' house and lot to the plaintiff is a contract pursuant to which the defendants are obligated to sell and the plaintiff is obligated to buy said premises. In support of his position, the plaintiff points out that the document contains language which states that is it a "binding and enforceable contract," provides legal and equitable remedies to the purchaser in the event of the seller's default and creates a mutual obligation clearly understood by the parties hereto.
Defendants, on the other hand, argue that said document was merely a binder as the same lacked an essential term, i.e., the date of closing. Defendants further claim that given the language used and the circumstances surrounding the execution of the document, as determined by the conduct and testimony of the parties, it was clear to all that the execution of a future, more formal, document would be necessary to fully and legally bind the parties in a contractual relationship.
In making a determination as to whether a document constitutes a contract or something short of a contract the court should be guided by the intent of the parties which is to be determined by the language used, the circumstances surrounding the execution of the document and the conduct of the parties vis-a-vis those circumstances. Cutter DevelopmentCorporation v. Peluso, 212 Conn. 107, 110 (1989); Kakalik v. Bernardo,184 Conn. 386, 393 (1981). The title of the document and language contained therein stating that the document is or is not one thing or the other is not determinative of the issue. The key element is the nature of the obligation imposed by the document on the parties. The key question is, therefore, was it the intention of the parties to consummate a sale?Cutter Development, supra, 212 Conn. 111.
In this case, this court finds, despite the named defendants' and Murphy's testimony to the contrary, that the document in question was a contract which did obligate the defendants to sell and the plaintiff to buy the defendants' house and lot located on Camp Dutton Road in Litchfield. The preliminary negotiations, the implementation of the bidding process occasioned by the Witherspoons involvement, the title of the document, the pre-printed language in the document, the payment of a substantial deposit and the conduct of the parties all lead to one conclusion, i.e., that it was the intention of the parties to consummate the sale. The document was a contract which memorialized that intent. CT Page 10567 Whether that contract is an enforceable contract is another issue to be addressed.
B. The Statute of Frauds
Defendants argue that should the court find, as it has, that the document in dispute is a contract of sale, the contract is unenforceable as the same is not in compliance with our statute of frauds. Connecticut's Statute of Frauds is codified in General Statutes §52-550 which provides:
 (a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: (1) Upon any agreement to charge any executor or administrator, upon a special promise to answer damages out of his own property; (2) against any person upon any special promise to answer for the debt, default or miscarriage of another; (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest in or concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof; or (6) upon any agreement for a loan in an amount which exceeds fifty thousand dollars.
 (b) This section shall not apply to parol agreements for hiring or leasing real property, or any interest therein, for one year or less, in pursuance of which the leased premises have been or are actually occupied by the lessee, or any person claiming under him, during any part of the term.
(Emphasis added.)
Judge Landau in the recent case of Killion v. Davis, 69 Conn. App. 366,372 (2002), provided an excellent analysis of application of this statute by our appellate courts:
The primary purpose of the statute of frauds "is to provide reliable evidence of the existence and the terms of the contract, the requirements of the statute can be met either by a single document or, as in this case, by a series of related writings which, taken together, describe the essential terms and conditions of the contract. Vachon v. Tomascak, 155 Conn. 52, 56-57, 230 A.2d 5 (1967); CT Page 10568 Burns v. Garey, 101 Conn. 323, 329, 125 A.467 (1924); Shelinsky v. Foster, 87 Conn. 90, 97-98, 87 A. 35 (1913); Restatement (Second), Contracts § 208 (Tentative Draft 1973)." Heyman v. CBS, Inc., 178 Conn. 215, 221, 423 A.2d 887 (1979); see also Jacobs v. Thomas, 26 Conn. App. 305, 310, 600 A.2d 1378 (1991), cert. denied, 221 Conn. 914, 603 A.2d 404 (1992). "The memorandum required by the statute is sufficient if it states the contract between the parties with such certainty that the essentials of the contract can be determined from the memorandum itself without the aid of parol proof, either by direct statement or by reference therein to some other writing or thing certain." Vachon v. Tomascak, supra, 57. "The memorandum of the contract need not be the contract itself. . . . The memorandum need not be made at the time of the contract; it may be made and signed afterward. . . . The moment written evidence of the contract under his hand, in whatever form, exists, the contract is taken out of the statute, citing Wood on Statute of Frauds, § 334. See 2 Corbin, Contracts § 503 (1950); Restatement (Second), Contracts § 214 (Tentative Draft 1983)." (Internal quotation marks omitted.) Heyman v. CBS, Inc., supra, 222-23. Cross references to the agreement in documents can adequately demonstrate their interconnection. See id., 223.
(Emphasis added.)
A writing, in order to avoid the harsh consequences of the statute, must contain the essentials of the parties' agreement which must consist of the subject of the sale, the terms of the sale and the identification of the parties involved so as to constitute a complete agreement. Lynchv. Davis, 181 Conn. 434, 438 (1980). The statute is also satisfied where the contract or memorandum contains by reference some other writing or thing certain. Robert Lawrence Associates, Inc. v. Del Vecchio,178 Conn. 1, 12-13 (1979). "Our courts prefer interpretations that find agreements sufficiently definite to satisfy the statute of frauds." Id.Fruin v. Colonnade One at Old Greenwich Ltd., Partnership,38 Conn. App. 420, 427, (1995), aff'd, 235 Conn. 916. "The exchange of correspondence between the parties after the signing of the contract confirms the existence of a contractual relationship between them." Each and every term of the contract does not have to be set forth in the writing, only those terms which are "essential." Id., Extrinsic information, although not introduced to contradict the terms of the writing, may be employed in ascertaining the meaning intended by the parties. Keefe v. Norwalk Cove Marina, Inc., 57 Conn. App. 601, 608-09, cert. denied, 254 Conn. 903 (2000). Parol evidence, therefore, of the CT Page 10569 location or description of the land and other matters referred to in the writing, is admissible to explain the terms of the contract. Gendalmanv. Mongillo, 96 Conn. 541, 544 (1921). "Where an agreement in writing is expressed in technical or incomplete terms, parol evidence may be admissible to explain that which, taken alone, would be unintelligible, when such explanation is not inconsistent with the written terms of the instrument." Falletti v. Carrano, 92 Conn. 636 (1918). Evidence outside the four corners of the contract may be considered to explain ambiguities in the writing, to prove a collateral oral agreement consistent with the writing or to add a missing term where the writing itself shows a complete agreement was lacking. HLO Land Ownership A. Ltd. Partnershipv. Hartford, 248 Conn. 350, 358 (1999). However, the mere fact that the parties interpret language differently does not, in and of itself, establish ambiguity. United Illuminating Co. v. Wisvest-Connecticut,LLC, 259 Conn. 665, 670 (2002).
Plaintiff argues that four documents in evidence, when those documents are considered together, provide the essential terms required by the statute of frauds. Those documents are. the sales "Agreement," the residential Disclosure Report (Part of Plaintiff's #4), the Addendum (Plaintiff's Exhibit #40) and the Rental Agreement (Plaintiff's Exhibit #8). Each of these exhibits has been alluded to by the court in its finding of the relevant facts. Plaintiff claims that examination of these documents will reveal that the parties agreed on the property to be sold, and sales price and identified the parties to the transaction. Plaintiff further claims that, given the totality of all the circumstances, the unsigned "Addendum" and the rental agreement provide the basis for a conclusion that the parties agreed to a closing date of May 1, 2000, or a reasonable date thereafter.
Defendants vehemently argue, and this court agrees, that the evidence at trial clearly demonstrates that no closing date was ever agreed to or established by the parties. Whether or not that finding implicates the Statute of Frauds, however, will be discussed in detail elsewhere. Defendants further argue that the mistaken and incomplete information contained in the written "Agreement" separately and in total are such as to involve the statute in that the "Agreement" lacked the essential terms of the bargain.
(1) Name, Street and Sales Price
Although the defendants argue that the court should consider the misspelling of the defendants' surname, the insertion of "Hill" in the street address and the misalignment of the balance due at closing as nonagreement as to essential terms, the court is not persuaded by that argument. The testimony of the named defendant clearly confirmed CT Page 10570 agreement on these issues. There is no doubt in this court's mind that the defendants intended to sell their house and lot located on Camp Dutton Road in Litchfield to the plaintiff at a sales price of $701,000 with a deposit of ten percent, and the balance of $630,900 due in cash at closing with no mortgage contingency. The fact that the parties failed to cross out the word "Hill" from the property address and correct the misspelling of the defendants' name, does not alter that finding. The failure of the plaintiff to initial the changes made by the defendants to correct the misalignment of the numbers does not alter that finding. A manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined. Presidential Capital Corp. v. Reale, 231 Conn. 500,507 (1994).
2. The Property Description
Defendants argue that the "Agreement" fails under the Statute of Frauds because the description of the property covered by said agreement is erroneous, incomplete and confusing. "Reasonable certainty in the description is an indispensable prerequisite for enforcement . . . of a contract to convey land." McMahon v. Plumb, 88 Conn. 547, 551 (1914). If the only manner in which the court can ascertain the precise parcel of land which was the subject of the parties agreement is via resort to the parties pre-agreement negotiations, the agreement would be contrary to the requirements of the Statute of Frauds. Gendelman, supra, 96 Conn. 550. Defendants claim that the only source by which the property can be accurately identified in this case is by the testimony of the parties as to the preliminary negotiations.
The first page of said agreement refers to the property as "103 Camp Dutton Hill Road" and makes no reference to two lots. The second page, however, contains the following:
 "SUBJECT TO AN EASEMENT IN FAVOR OF THE LITCHFIELD LAND TRUST ON THE LOWER LOT LOCATED JUST WEST AND CONTIGUOUS TO THE HOUSE LOT."
(Emphasis added.)
Furthermore, the "Residential Property Condition Disclosure Report" (Plaintiff's Exhibit #5) attached to the agreement contains the following:
"Land trust easement on Lot #4 prior to closing."
During the trial the named defendant freely admitted that all the CT Page 10571 parties understood that the subject of the agreement was two lots, Lot #3, the lot upon which the house is located and Lot #4, an undeveloped lot relative to which the defendants were to encumber via a conservation easement. This testimony and the disclosure report do not contradict the property description in the Agreement; they clarify it. This court finds, therefore, that the description of the parcel that was to be conveyed by the defendants to the plaintiff is reasonably determined by reference to the agreement, the disclosure report and the oral statements of the parties. As such it does not run a foul of the statute of frauds.McMahon, supra, 88 Conn.
3. The Lack of a Closing Date
Plaintiff argues that the lack of a closing date should not be a bar to the enforcement of the parties' Agreement as the court possesses the power, in such circumstances to impose a reasonable time by which the closing of the transaction would take place. Although the plaintiff concedes that the court cannot impose a condition which contradicts an existing term in the contract, the plaintiff argues that the insertion by the parties of the phrase "to be mutually agreed upon" in the paragraph which makes provision for a closing date, is no different than a case where the parties have left the closing date blank or have omitted any reference at all to a date of closing. The plaintiff, however, cites no authority to support that analogy.
Defendants argue that the fact that the parties specifically and mutually agreed to leave the setting of a closing date for determination by their subsequent agreement distinguishes this case from those cases which have permitted the court to impose a closing date. Defendants argue that since there is nothing in any of the four documents offered by the plaintiff as proof of a complete agreement which would establish a date certain for the closing, the "Agreement" lacks that essential term and is, therefore, volative of the Statute of Frauds. Furthermore, the defendants argue that since no date could be ascertained without oral testimony, the "Agreement" is subject to the statute and is, therefore, unenforceable.
The leading cases on this issue are Santoro v. Mack, 108 Conn. 683
(1929) and Turner v. Hobson, 16 Conn. App. 240 (1988) which are cited by each of the parties in their briefs. Before discussing those cases, however, some general comments are appropriate. Our Supreme Court has held that each and every detail of the bargain need not be spelled out in the memorandum in order for the parties agreement to be enforceable. "Even if the parties have left some terms of their agreement indefinite, a court may enforce the agreement . . . [if those terms are not material to the bargain.]" (Emphasis added.) O'Sullivan v. Bergenty, 214 Conn. 641, CT Page 10572 652 (1990). Courts cannot change the terms of agreements negotiated by the parties or remake the parties' contract. If the parties chose not to insert certain provisions into their agreement, it is not the court's function to substitute its judgment for theirs. "It is not within the power of courts to create new and different agreements." Bank of BostonConnecticut v. Schlesinger, 220 Conn. 152, 159 (1991); Jay Realty, Inc.v. Ahern Development Corporation, 189 Conn. 52, 55 (1983).
In Santoro v. Mack, supra, the Supreme Court addressed the distinction between a contract for sale of real estate that was totally silent as to a closing date, and a contract for sale of real estate that purports to address a time limitation for a closing date, but does so in a fashion that does not satisfy the Statute of Frauds. In this regard, the Supreme Court stated:
 This memorandum is also silent as to when the contract is to be completed. Here, too, if the parties did not in fact agree upon a time to complete the contract, the law raises a presumption that it is to be done within a reasonable time. This is a rule of wide application, but this memorandum provides that the balance and adjustments are to be figured at date of bill. We must assume that this refers to a time when the contract is to be carried out and the papers passed, and it clearly points to the fact that some time was in the contemplation of the parties as one of the terms of the agreement. There is nothing in the memorandum by which the time of the carrying out of the agreement can be determined. In this respect also, the memorandum lacks that certainty which our rule requires. For these reasons we cannot hold the memorandum a sufficiently compliant with the rule. A complaint based upon it would not carry out the true and entire agreement of the parties.
(Emphasis added.) Id., 689-690.
In Turner v. Hobson, supra, the real estate contract provided: "financing to be mutually agreed upon between buyer and seller." The trial court granted a motion for summary judgment finding that the contract with that provision could not satisfy the Statute of Frauds.
The Appellate court affirmed, holding that:
In stating that financing was to be mutually agreed upon by the parties, but failing to state in the memorandum what the terms of the financing were, the contract lacked essential terms and was therefore unenforceable. CT Page 10573
Id., 243.
In Turner, the plaintiff argued that in the absence of the mutual agreement that the court should presume the balance of the purchase price was to be paid in cash. Here, the plaintiff argues that in the absence of an agreement on a closing date, a closing date should be set at a reasonable time. In Turner, the Appellate Court rejected the argument of the plaintiff, stating:
 If the balance were to be paid in cash or by mortgage to be held by a third party, there would be no need to provide for mutual agreement between the buyer and the seller as to financing. The plaintiff cannot now seek to override the express terms agreed to by the parties to facilitate his own ends.
Id., 243.
In the instant case, the "Agreement" required a future agreement by the parties as to the date of closing. None of the four documents offered by the plaintiff as the "memorandum" required by the Statute of Frauds establishes a closing date. The date of closing could not be established without oral testimony at trial. The plaintiff has failed to convince this court by a fair preponderance of that oral testimony and documentary evidence that the parties ever reached a mutual agreement as to a closing date. As noted, the plaintiff asks this court to set a closing date, however, if the court did so, it would be acting contrary to the bargain negotiated by the parties which required mutual assent to set the date of closing. If the court were to set the date, it would be ignoring the Statute of Frauds and the case law interpreting and implementing said statute. In this case, this court finds that the date of closing was a term material to the bargain entered into by and between the plaintiff and the defendants. If this court were to refashion that bargain so as to insert a closing date, such action would run counter to the letter and spirt of the Statute of Frauds. There is nothing in the "Agreement" or in any of the documents offered by the plaintiff which would provide a reasonable basis for the court to set a closing date. There is no event the occurrence of which would trigger a setting of a closing within a reasonable time of such occurrence. See Christophersen v. Blount,216 Conn. 509, 510 (1990) where the closing was to take place within fourteen days of zoning approval.
C. Part Performance
It is well settled in Connecticut law that the partial performance by a CT Page 10574 party of his or her obligations under a contract unenforceable due to the proscriptions of the Statute of Frauds, may, nevertheless, remove the contract from the statute. Our Supreme Court stated in the case of Ubyszv. DiPietro, 185 Conn. 47, 54 (1981):
 We have held that acts on the part of the promisee may be sufficient to take a contract out of the statute if they are such as clearly refer to some contract in relation to the matter in dispute . . . "The doctrine of part performance arose from the necessity of preventing the statute against frauds from becoming an engine of fraud. [T]he acts of part performance generally must be such as are done by the party seeking to enforce the contract, in pursuance of the contract, and with the design of carrying the same into execution, and must also be done with the assent, express or implied, or knowledge of the other party, and be such acts as alter the relations of the parties. The acts also must be of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute . . . ."
(Citations omitted; emphasis added; internal quotation marks omitted.)
Our courts have held that the payment of the purchase price (or a substantial deposit toward the purchase price) does not in and of itself constitute part performance of the contract. Camerota v. Wisniewski,21 Conn. Sup. 88, 90 (1958); McMahon v. Plumb, supra, 88 Conn. 553. Giving possession of the land to the prospective purchaser has been held to meet the test of part performance, particularly when the prospective purchaser has also made substantial improvements to the land. Breen v.Phelps, 186 Conn. 86, 95 (1982). Acts of a purely preliminary nature such as measuring or surveying the land, planning for improvements and other acts prior to acquiring title have been deemed not to amount to the requisite partial performance. Camerota, supra, 21 Conn. Sup. 91. "The modern tendency is to deemphasize particular kinds of acts as formulae for the application of an equitable doctrine designed to relieve one who has reasonably relied upon a promise of another from a substantialdetriment entailed by the change of position so induced." (Emphasis added.) Breen, supra, 186 Conn. 96. Plaintiff claims as a basis for part performance of the contract that he paid a substantial deposit, met with designers and contractors, entered into construction contracts, took possession of a portion of the premises and sold his condominium — all in reliance upon the "Agreement" entered into by the parties. Plaintiff claims that such action on his part constituted the change of position and substantial detriment referred to in the cases cited above. CT Page 10575
The evidence clearly showed that the plaintiff reached no agreement with the named defendant doing business as Abilities Unlimited, LLC. In fact, said defendant returned the plaintiff's deposit check and wrote "void" thereon (Plaintiff's #6.). Although the plaintiff received a proposal from New England Stair relative to the purchase and installation of the staircase, there was no evidence that the plaintiff ever accepted the proposal or paid any monies pursuant thereto. (Plaintiff's Exhibit #45.) Although the plaintiff met with an employee of Home Depot as to the Kitchen Cabinets and discussed other improvements with the original architect of the dwelling, there was no evidence that he paid any sums as a result of those discussions. The "possession" of the premises which the plaintiff claims establishes the requisite part performance was not his personal occupancy of the premises, but the use of a small portion of the premises for furniture storage as evidenced by the rental agreement. (Plaintiff's #8.) Plaintiff did not take "possession" of the premises as that term is used in the cited cases. This court finds that the actions by the plaintiff referred to herein are not such as to constitute the requisite part performance, did not change his position and did not result in any substantial detriment to him.
Plaintiff, however, in addition to the above actions, claims that he entered into a contract to sell and did in fact sell his condominium solely in reliance upon the agreement with the defendants to purchase their dwelling. The evidence, however, reveals that contrary to the plaintiff's testimony and sworn affidavit (Defendants' Exhibit #1, Par. #27), that he listed his condo unit for sale in November, 1999, in reliance upon the agreement with the defendants, he actually listed said unit for sale a full two months prior thereto. (Defendants' Exhibit #29.) After the closing of the sale of said unit in April, 2000, the plaintiff took up residence with his fiancee whom he subsequently married and with whom he continues to reside. This court finds that the evidence clearly establishes that the impetus of the sale of the plaintiff's condo was his impending marriage and not his agreement with the defendants to purchase their dwelling. Plaintiff has failed to establish by a fair preponderance of the evidence that level of part performance required by the cited cases.
D. Conditions Precedent
Although this court has found that the "Agreement" entered into by the plaintiff and the defendants concerning the sale of defendants dwelling is not enforceable per the Statute of Frauds and that neither the other documents offered by the plaintiff nor the doctrine of part performance remove said agreement from the statute, the court must address other claims of law raised by the parties and the factual basis therefore.[6]
CT Page 10576
Defendants claim that there were two conditions precedent in the parties "Agreement" that had not been complied with which would preclude the court's ability to enforce said agreement, apart from any Statute of Frauds issue. The first condition has already been discussed herein, i.e., the requirement that the closing date be set by mutual agreement. The second condition claimed by the defendants is the execution and recording of the conservation easement on the lower lot (Lot #4) in favor of the Litchfield Land Trust.
The nature and effect of a condition precedent was discussed in Lachv. Cahill, 138 Conn. 418, 421 (1951) wherein Justice Baldwin stated:
 A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. McIsaac v. Hale, 104 Conn. 374, 379, 132 A. 916; McFarland v. Sikes, 54 Conn. 250, 251 7 A. 408; 3 Corbin, Contracts 628 at p. 515, 629; 5 Page, Contracts (2d Ed.) 2586; Restatement, 1 Contracts 250. A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. 3 Corbin, Contracts, 633. If the condition is not fulfilled, the right to enforce the contract does not come into existence. Bialeck v. Hartford, 135 Conn. 551, 556, 66 A.2d 610; Sheketoff v. Prevedine, 133 Conn. 389, 393, 51 A.2d 922; Fischer v. Kennedy, 106 Conn. 484, 490, 138 A. 503; Webb v. Moeller, 87 Conn. 138, 141, 87 A. 277; 3 Williston, Contracts (Rev. Ed.) 675; Restatement, 1 Contracts 257. Whether a provision in a contract is a condition the nonfulfillment of which excuses performance depends upon the intent of the parties, to be ascertained from a fair and reasonable construction of the language used in the light of all the surrounding circumstances when they executed the contract. New Haven Sand Blast Co. v. Dreisbach, 102 Conn. 169, 180, 128 A. 320; Sugrue v. Champion, 128 Conn. 574, 577, 24 A.2d 890; 3 Corbin, Contracts, p. 544; 5 Page, Contracts (2d Ed.) 2579.
(Emphasis added.)
If the condition expressed in the contract is not met then the court cannot enforce the contract. Christophersen v. Blount, supra, 512.
As to the conservation easement, it was the responsibility of Attorney CT Page 10577 Litwin to negotiate and prepare said easement for execution and recording. That duty was owed to the defendants who retained him for said purpose some months prior to Attorney Litwin's representation of the plaintiff in the closing of the sale. There was no evidence at the trial that the terms of the draft of the conservation easement (Plaintiff's Exhibit #35) were ever discussed with the defendants let alone were ever accepted by them, nor was there any evidence that the draft was acceptable to the Litchheld Land Trust. During the many conversations and exchanges of correspondence between Attorney Litwin and Attorney McCormick as they attempted to work toward a closing date, the issue of the conservation easement was not discussed.
This court finds that, absent the Statute of Frauds issue, the "Agreement" executed by the parties relative to the sale of defendants' dwelling to the plaintiff is unenforceable because the two conditions precedent were never fulfilled. No closing date was ever agreed to and no conservation easement was approved either by the defendants or by the Litchfield Land Trust.
E. The Remedy of Specific Performance
Had the court found that the parties agreement was an enforceable contract and in compliance with the Statute of Frauds, the plaintiff sought the remedy of specific performance for defendants' alleged breach of that contract. Simply put, the plaintiff asks the court to order the defendants to sell their dwelling and lot to the plaintiff under the terms and conditions agreed to for the agreed price of $701,000 which, the plaintiff claims, he has been and is ready, willing and able to pay.
The remedy of specific performance is an equitable remedy which is addressed to the sound discretion of the court. Webster Trust v. Roly,261 Conn. 278, 284, ___ A.2d ___ (2002). The court must determine, under all of the relevant circumstances whether the contract is fair and reasonable and made in accordance with the law. Robert LawrenceAssociates, Inc. v. Del Vecchio, 178 Conn. 1, 18 (1979). The court not only possesses, in a proper case, the authority to award specific performance, but also to award monetary damages incidental to the equitable remedy. The remedy of specific performance is not an entitlement, but is dependent upon equitable considerations from the prospective of each party. Kakalik v. Bernardo, supra, 184 Conn. 395. An action seeking the remedy of specific performance of a contract to sell real estate, likewise, is to be determined by a consideration of ethical principles. "The granting of specific performance of a contract to sell land is a remedy which rests in the broad discretion of the trial court depending on all of the facts and circumstances when viewed in light ofsettled principles of equity." (Emphasis added.) Webster Trust v. Roly, CT Page 10578 supra, 261 Conn. 284, citing, Frumento v. Mezzanotte, 192 Conn. 606, 615
(1984).
1. Ready, Willing Able
"A buyer seeking specific performance must prove that he was ready, willing and able to purchase the property." (Internal quotation marks omitted.) Steiner v. Bran Park Associates, 216 Conn. 419, 423 (1990). "A buyer must prove his financial ability to go forward even when a seller entirely refuses to participate in a closing". DiBella v. Widlitz,207 Conn. 194, 200 (1988). Even in the case of an anticipatory breach, the injured party must prove that he or she would have had the ability to complete the transaction had there been no such breach. McKenna v.Woods, 21 Conn. App. 528, 534 (1990).
In the instant case, the plaintiff urges the court to find that the plaintiff was ready, willing and able to complete the purchase as no evidence was offered to prove that the plaintiff was financially unable
to make the purchase. This argument, however, ignores the fact that it is the plaintiff's burden to prove, by a fair preponderance of the evidence, that he was "ready, willing, and able" to complete the purchase; it is not the defendants' burden to disprove this fact. Plaintiff offered no evidence at trial, such as bank records or other financial records or a mortgage commitment,[7] which would demonstrate his ability to raise the $630,900 balance due on the purchase price. The court cannot, in lieu of such proof, engage in total speculation and presume that the plaintiff had the financial ability to complete the deal, although this court has no doubt as to the plaintiff's readiness or willingness to do so.
2. Equitable Considerations
Defendants argue that even if the parties' agreement was deemed to be enforceable by the court, a consideration of the equities would preclude the remedy of specific performance in this case. Defendants cite LaCroixv. LaCroix, 189 Conn. 685, 689 (1983) for the fundamental equitable principle that "one who seeks equity must do equity and expect that equity will be done for all." Defendants also cite as "fundamental" the so-called "clean hands doctrine" as being applicable to the facts of this case. The defendants argue that the plaintiff was not a credible witness, provided perjured testimony, fabricated and altered exhibits and filed a false sworn affidavit. Defendants argue that in light of this alleged behavior if the court were to order specific performance, it would be a condonation of perjury, citing Pappas v. Pappas, 164 Conn. 242,245-246 (1973). Defendants, for their part, assert that once they executed the "Agreement" to sell their dwelling to the plaintiff, they CT Page 10579 acted in good faith to find suitable alternative housing, submitting bids on three separate houses and that the plaintiff was well aware of their activities in this regard.
Without detailing all of the examples offered by the defendants this court does find that the equities clearly favor the defendants based upon the tactics employed by the plaintiff in pursuing the acquisition of defendants' dwelling, in preparing this case for trial and in his testimony at trial.
As indicated the defendants never listed the dwelling for sale. When Murphy informed the plaintiff of the possibility that said dwelling might be available for purchase, the plaintiff, having some knowledge of defendants' parcel, was determined to see it. The plaintiff then pressured Murphy, who was the plaintiff's friend and who was selling the plaintiff's condo, to, in turn, pressure the defendant Kathy, who was Murphy's employee. Murphy then proceeded to pressure said defendant despite several refusals to permit the plaintiff to view the exterior of the premises. Thereafter, through more prompting by the plaintiff and Murphy, the plaintiff viewed the interior of the premises. Once the plaintiff saw the interior, he aggressively pursued his goal of acquiring the defendants' dwelling. Despite being aware of the defendants need to find suitable alternative housing, the plaintiff, within a week of the execution of the "Agreement," began to pressure the defendants for a closing date (Plaintiff's Exhibit 14). The evidence clearly demonstrates that the plaintiff was obsessed with the goal of acquiring the defendants dwelling and aggressively pursed that goal with little or no consideration of the defendants' legitimate interest in obtaining appropriate alternative housing.
In anticipating litigation over this matter, the plaintiff took several actions relative to evidential matters which are disconcerting to this court. As noted, the named defendant returned the plaintiff's check in the amount of $1500 (Plaintiff's #6) which was unsolicited by said defendant and was marked "VOID" by said defendant when returned. In a sworn affidavit dated August 10, 2001 (Defendants' #1, Paragraph #32), the plaintiff claimed that "I paid the defendant $1500 to start the work." Sometime after the named defendant returned said check to the plaintiff someone attempted to white out the word "VOID." A significant portion of the plaintiff's claim for money damages, an issue hereinafter discussed, is his claimed entitlement to reimbursement for rental payments to his fiancee which were necessitated by the defendants' alleged breach of the parties' agreement. Plaintiff claims that he was compelled, once he sold his condo in reliance on said agreement, to move in with his fiancee at a monthly rental of $1,800. Plaintiff seeks reimbursement of the rental payments from June, 2000 to August 18, 2001, CT Page 10580 the date of his marriage — a total claim of $27,000. At trial the checks relative to said claim were admitted as evidence during the defendants' cross-examination of the plaintiff. (Plaintiff's Exhibit #22.) Four checks were dated after the date of marriage and eleven of them were deposited during the first week of November, 2001, shortly after the original date the case was assigned for trial. Moreover, all of the checks were drawn on the plaintiff's professional account and most are sequentially numbered ten checks apart. The circumstances of the creation and deposit of these checks to bolster a claim for rental payments occasioned by the alleged breach by the defendants, in light of the fact, as this court has found, that the sale of the plaintiff's condo and removal to his fiancee's home was occasioned not by his "Agreement" with the defendants, but by his planned marriage, is suspect indeed.
At trial, the plaintiff's credibility was significantly impeached on many evidential issues material to this case. On direct examination, the plaintiff testified that, prior to this transaction, he did not know the defendant Kathy, however, on cross examination he admitted that she was his patient since January, 1999. Plaintiff testified that the defendants' solicited him to purchase their dwelling, yet the credible testimony from Murphy establishes that, at the plaintiff's prompting, Murphy made three or four requests of the defendant Kathy before she reluctantly agreed to allow the plaintiff to view the exterior of her dwelling. As previously noted, the plaintiff testified that he would not have sold his condo had he not had a firm agreement with the defendants' to purchase their dwelling, yet the evidence clearly shows that the plaintiff listed his condo for sale two months prior to the execution of the "Agreement" with the defendants.
In his sworn affidavit (Defendants' #1, Paragraph #42), the plaintiff stated that the rental agreement (Plaintiff's #8) was prepared by Attorney McCormick, yet admitted on cross-examination that Attorney Litwin prepared the same at the plaintiff's request. In Paragraph #16 of his amended complaint dated December 27, 2000, the plaintiff alleged that the purchase and sale contract was prepared by the defendants, yet the testimony clearly revealed that, acting on the plaintiff's behalf in competition with the Witherspoons, Murphy prepared the "Agreement."
In light of the plaintiff's conduct, as described above, from the beginning of this transaction through the trial of the case, and in light of settled principles of equity, this court would not grant to the plaintiff the remedy of specific performance even if the court had found that the parties' "Agreement" was an enforceable contract.
F. Monetary Damages
CT Page 10581
In the Third Count of his amended complaint, the plaintiff seeks "incidental and consequential damages" for the alleged breach of "the underlying agreement" by the defendants. Paragraph 30 of said complaint alleges that the parties' agreement required the defendants to complete construction of certain items, however, as previously noted, the "Agreement" executed by the parties mandates no improvements by the defendants and, in effect, binds the plaintiff to accept the property as is. However, if the court were to view the allegations in the Third Count most liberally in favor of the plaintiff the court could find that the simple claim that there was an agreement which the defendants breached resulting in monetary loss to the plaintiff stated a plausible cause of action for money damages. Assuming the sufficiency of that cause of action, the plaintiff would have the burden of proving his entitlement to an award of money damages.
Plaintiff asks the court to award him money damages based on evidence offered at trial for the removal of his furniture to and from the defendants' dwelling ($415.88 for the initial move and $706.12 for the second move); storage of the furniture since its removal from May 18, 2001 until trial at $135 per month; the rental paid to his fiancee (previously discussed herein) in the amount of $1800 per month and his mortgage application fee of $350.
Plaintiff's claim for money damages is based upon a cause of action founded upon the breach of a claimed contract. This court has already ruled that the "Agreement" entered into between the parties is unenforceable as the same is volative of the Statue of Frauds. Our supreme Court stated in Kilday v. Schancupp, 91 Conn. 29, 32 (1916);
 It is immaterial whether the action be one for specific performance, or for damages for the breach of a contract of sale of land. The proof must be in the manner provided by our statute; and the agreement in its essentials must be the same in either action. Lord Farwell succinctly stated the principle in Wild v. Woolwich Borough Council, L.R. (1910) 1 Ch. Div. 35, 42: "It is perfectly clear that if there was no contract there can be no damages for breach of contract, and any claim to compensation is out of the question."
(Emphasis added.)
In the event that the plaintiff was able to prove the requisite partial performance, which, as this court has found, he was unable to do, the plaintiff would be unable to recover money damages. Wolfe v. WallingfordBank Trust Co., 122 Conn. 507, 511 (1937). The doctrine of part CT Page 10582 performance does not apply to actions at law.
This court, therefore, having found that the parties "Agreement" is unenforceable so as to negate the equitable remedy of specific performance, finds that said agreement is likewise unenforceable so as to negate the remedy at law for breach of contract.[8]
 G. The Witherspoon Testimony
Since the defendants have raised the issue, the court will briefly address the significance of the testimony of Attorney Witherspoon, the unsuccessful bidder on the defendants' dwelling. In their brief, the defendants assume that the testimony was offered either to impugn the character of the defendants or to show the similarity in the provisions of the buy-sell agreement. Defendants argue that the testimony was not probative of any claim made by the plaintiff, was not relevant and should have been disallowed or stricken.
 Generally, it may be said that any legally competent evidence which, when taken alone or in conjunction with other evidence, tends to prove or disprove a material or controlling issue or to defeat the rights asserted by one or the other of the parties, and sheds any light upon or touches the issues in such a way as to enable the jury to draw a logical and reasonable inference with respect to the matter or a principal fact in issue, is relevant. Conversely, evidence of collateral or other facts which are incapable of affording any reasonable presumption or inference as to a principal issue or matter in dispute, or evidence which is too remote, is irrelevant and inadmissible.
Asselin, Trial Handbook For Connecticut Lawyers, The Lawyers Cooperative Publishing Co., Rochester, N.Y. 1990, Chapter XV, § 142, p. 152.
This court found quite relevant the fact that two persons were negotiating the purchase of the defendants' dwelling with the defendants at the same time. That fact certainly impacted on the issue of the level of reluctance of the defendants to sell if, as it were, the price was right. As noted, the price was the ultimate motivation by the named defendant to accept the plaintiff's offer.
H. Specific Performance As To Lot #4
In conjunction with the commencement of this action, the plaintiff, in order to perfect the remedy of equitable and statutory specific performance (Second Count), recorded a copy of the "Agreement" on the CT Page 10583 Litchfield Land Records. Plaintiff took this action pursuant to §47-33a of the General Statutes which provides:
 (a) No interest in real property existing under an executory agreement for the sale of real property or for the sale of an interest in real property or under an option to purchase real property shall survive longer than one year after the date provided in the agreement for the performance of it or, if the date is not so provided, longer than eighteen months
after the date on which the agreement was executed, unless the interest is extended as provided herein or unless action is commenced within the period to enforce the agreement and notice of lis pendens is filed as directed by section 52-325.
 (b) The interest may be extended only by reexecution of the written agreement or by execution of a new written agreement, provided the agreement, whether reexecuted or newly executed, shall be recorded as directed by Sections 47-10 and 47-17. The period provided by this section shall not otherwise be extended, whether because of death, disability or absence from the state or for any other reason. Upon the expiration of an interest the title to property affected by the interest shall not thereafter be considered unmarketable because of the expired interest.
 (c) Nothing in this section shall be construed to limit or deny any legal or equitable rights a party may have under the agreement except the right to have the agreement specifically enforced.
(Emphasis added.)
Since the "Agreement" contained no legal description, the plaintiff attached a legal description to it prior to recording which was also attached to the plaintiff's complaint. The legal description, however, was of Lot #3 only, the "house lot." The legal description as to Lot #4, "the lower lot," was not recorded or made part of the plaintiff's complaint until midway through the trial. The court, over defendants' objection, allowed the amendment to the complaint, however, the court made no ruling as to the effect, if any, on the remedy of specific performance as applied to Lot #4 vis-a-vis the requirements set forth in the afore-mentioned statute. CT Page 10584
The amendment to the complaint and the land records was on a date many months beyond the eighteen month restriction provided in said statute. Plaintiff cites First Constitution Bank v. Harbor Village LimitedPartnership, 230 Conn. 816 and Judge Mulcahey's decision in Beier v.Wright, Superior Court, judicial district of Hartford, Docket No. 580410 (February 19, 1999, Mulcahey, J.), #CV 98-580410 (Hartford J.D., February 19, 1999 as authority for our court's liberal philosophy in allowing amendments to a lis pendens where the opposing party suffers no prejudice. As the defendants correctly point out, however, those cases do not deal with the impact of a late filling to correct an erroneous description on the remedy of specific performance. The cited statute explicitly limits the remedy of equitable and statutory specific performance to any "interest in real property" perfected in the manner and within the time limits provided therein. Any interest which the plaintiff may have had in Lot #3 was, pursuant to said statute, appropriately perfected. Any interest which the plaintiff may have had in Lot #4, however, was extinguished eighteen months after the date of the "Agreement." In the event that this court found that the plaintiff was entitled. to a decree of specific performance of said "Agreement," the court would lack the authority to order such remedy relative to Lot #4.
I. Bad Faith
Plaintiff's Fourth Count in his Amended Complaint alleges that the defendants "acted in bad faith" in not agreeing on a closing date and in not otherwise complying with the "Agreement." Neither the plaintiff in his twenty-eight page brief nor the defendants in their seventy-six page brief[9] discuss the issue of bad faith. The court, nevertheless, will "briefly" address the issue.
"To prove a claim for bad faith under Connecticut law, the plaintiff's [are] required to prove that the defendants engaged in conduct design[ed] to mislead or to deceive . . . or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties. . . . [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity . . . it contemplates a state of mind affirmatively operating with furtive design or ill will. . . . Moreover, [b]ad faith is an indefinite term that contemplates a state of mind affirmatively operating with some design or motive of interest or ill will." (Citation omitted; internal quotation marks omitted.) Chapman v. Norfolk Dedham Mutual Fire Ins. Co., 39 Conn. App. 306, 320, 665 A.2d 112, cert. denied, 235 Conn. 925, CT Page 10585 666 A.2d 1185 (1995).
Elm Street Builders, Inc. v. Enterprise Park Condominium Assn., Inc.,63 Conn. App. 657, 667-68 (2001). Plaintiff has not produced any evidence that would convince the court that the defendants, in their dealings with the plaintiff, acted in bad faith as that term is applied in Connecticut law.
IV. CONCLUSION
Based upon the foregoing, this court finds that the plaintiff has failed to prove by a fair preponderance of the credible evidence, each of the four counts of his amended complaint dated December 27, 2000.
Accordingly, judgment may enter in favor of the defendants and against the plaintiff on all four of said counts. The relief sought by the plaintiff is denied.
 _____________________ Wilson J. Trombley Judge