# T. CHRISTOPHER KILLION ET AL. *v.*
# IAN MARTIN DAVIS
# (AC 19034)

Foti, Landau and Daly, Js.

Submitted December 13, 2001—officially released April 23, 2002

*Jonathan Turley*, pro hac vice, with whom were *Lorey R. Leddy* and, on the brief, *Stefan R. Underhill*, for the appellant (defendant).

*Ronald P. Mysliwiec*, with whom were *Steven D. Ecker* and, on the brief, *Leigh A. Newman*, for the appellees (plaintiffs).

*Opinion*

LANDAU, J. This appeal returns to this court on remand from our Supreme Court; *Killion* v. *Davis*, 257 Conn. 98, 106, 776 A.2d 456 (2001); for a resolution of the remaining claims of the defendant, Ian Martin Davis. The Supreme Court reversed this court's judgment in *Killion* v. *Davis*, 59 Conn. App. 358, 757 A.2d 632 (2000), concluding that the defendant was personally liable to the plaintiffs, T. Christopher Killion and Brad J. Felenstein, with respect to moneys owed them pursuant to an oral agreement. The defendant's remaining claims pertain to the trial court's judgment in favor of the plaintiffs, specifically that the court improperly (1) concluded that the oral agreement between the plaintiffs and the defendant was not barred by the statute of frauds, (2) failed to correct factual and legal errors in the report of the attorney trial referee (referee) to whom the matter had been referred and (3) abused its discretion by awarding prejudgment interest. We affirm the judgment of the trial court.

The following facts are relevant to this appeal. The defendant and his wife, the only shareholders of Sports Marketing Group, Inc. (Sports Marketing), entered into an agreement with Times Mirror Magazines, Inc. (Times Mirror), to sell all of their stock in Sports Marketing for a substantial amount of money. The transaction was

consummated on June 14, 1989. As part of the sales agreement, the defendant entered into an employment contract with Times Mirror whereby he would continue to serve as the president of Sports Marketing.

The defendant had developed Sports Marketing during the 1980s with the assistance of the plaintiffs, who were key employees. Shortly before the consummation of the sale, the defendant approached the plaintiffs separately, asked them to continue to work for three years after the sale and promised them that if they did so, they each would receive $100,000. The defendant claims that he wanted the plaintiffs to share in the good fortune of the sale. The defendant benefited from the plaintiffs' continuing to help operate Sports Marketing.

The defendant and Times Mirror structured the sale to the defendant's financial benefit. Consequently, Times Mirror paid the defendant $154,000 less than the agreed price. The deducted sum represented the discounted cost of an incentive compensation package for the plaintiffs. The defendant and Times Mirror agreed that if the plaintiffs failed to stay at Sports Marketing for the requisite three years, the defendant was to receive the funds. Times Mirror agreed to this arrangement although it was not incorporated in the sales documents. Times Mirror did not care what the defendant did with his money. The plaintiffs were not parties to the sales agreement.

Shortly after the sale was transacted, the plaintiffs asked the defendant to provide the terms of their agreement in writing. In November, 1989, the defendant asked his attorney to draft incentive compensation agreements for the plaintiffs. His attorney did so and transmitted the draft agreements to the defendant. The defendant, however, never discussed them with Times Mirror or the plaintiffs. The draft agreements were never executed.

Due to disputes between the defendant and Times Mirror, the defendant was fired by Times Mirror before the end of his employment contract. Litigation between the two ensued in federal court. During the course of the federal litigation, the plaintiffs fulfilled their three year obligation and asked the defendant for their money. The defendant told the plaintiffs that they had to look to Times Mirror for their compensation. The parties settled the federal litigation by written stipulation on December 14, 1994. Pursuant to the stipulation, the defendant and Times Mirror agreed that a portion of the settlement money owed the defendant would be placed in escrow to be released to the plaintiffs if they prevailed in this action. If the plaintiffs did not prevail, the defendant was to receive the funds. The plaintiffs were not parties to the federal litigation and expended considerable effort to learn the terms of the stipulation.

The plaintiffs commenced this action in October, 1994. The court referred the matter to a referee for resolution. Following a hearing over several days, the referee concluded that the $100,000 owed the plaintiffs was the defendant's personal obligation, the plaintiffs' claims were not barred by the statute of frauds and the plaintiffs were entitled to prejudgment interest as of June 15, 1992. The court agreed. This court reversed the trial court's judgment on the question of the defendant's personal liability. The plaintiffs appealed to our Supreme Court, which reversed the judgment, concluding that the defendant was personally liable to the plaintiffs, and remanded the case for resolution of the remaining appellate claims.

Where the parties consent, a case may be referred to a referee. Practice Book § 19-2A. "The report of . . . [an] attorney trial referee shall state . . . the facts found and the conclusions drawn therefrom. . . ." Practice Book § 19-8. Unless the court concludes that the referee has materially erred, "[t]he court shall ren-

der such judgment as the law requires upon the facts in the report. . . ." Practice Book § 19-17 (a).

"While the reports of [attorney trial referees] in such cases are essentially of an advisory nature, it has not been the practice to disturb their findings when they are properly based upon evidence, in the absence of errors of law, and the parties have no right to demand that the court shall redetermine the facts thus found. . . .

"A reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of . . . attorney trial referees. . . . [Our Supreme Court] has articulated that attorney trial referees and factfinders share the same function . . . whose determination of the facts is reviewable in accordance with well established procedures prior to the rendition of judgment by the court. . . .

"Although it is true that when the trial court reviews the attorney trial referee's report the trial court may not retry the case and pass on the credibility of the witnesses, the trial court must review the referee's entire report to determine whether the recommendations contained in it are supported by findings of fact in the report. It is also true that the trial court cannot accept an attorney trial referee's report containing legal conclusions for which there are no subordinate facts." (Citations omitted; internal quotation marks omitted.) *Killion* v. *Davis*, supra, 257 Conn. 102.

With these legal precepts in mind, we now turn to the remaining claims of the defendant.

I

First, the defendant claims that the court improperly adopted the report of the referee, concluding that the

agreement between the parties was not barred by the statute of frauds. See General Statutes § 52-550 (a) (5).[1] Specifically, the defendant claims that there is no writing signed by him or by someone on his behalf in which he himself agreed to pay the plaintiffs for continuing to work for Sports Marketing for three years after the corporation was sold to Times Mirror. We disagree because the facts found and conclusions drawn by the referee are to the contrary.

The following facts found by the referee are relevant to our resolution of this claim. Just prior to the sale of Sports Marketing, the defendant told each of the plaintiffs that he wanted them to benefit from the sale of the corporation and that if they agreed to stay in the service of Sports Marketing for three years, they each would receive $100,000. Following these conversations, the parties exchanged a series of letters regarding the $100,000 payments. In response to the plaintiffs' requests for a writing memorializing the promised payments, the defendant's attorney drafted incentive compensation agreements with respect to each plaintiff and sent them to the defendant. The plaintiffs never saw the draft compensation agreements, and the agreements were never executed. The referee also found that the federal litigation between the defendant and Times Mirror was settled by means of a stipulated judgment containing provisions related to this action. The defendant signed the stipulation.

On the basis of these findings and others, the referee concluded, in part, that the correspondence between the plaintiffs and the defendant constituted writings sufficient to satisfy the statute of frauds, the stipulation

---

[1] General Statutes § 52-550 (a) provides in relevant part: "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (5) upon any agreement that is not to be performed within one year from the making thereof . . . ."

ending the federal litigation constitutes a writing signed by the defendant that satisfies the statute of frauds and the plaintiffs' performance of their three year obligation takes the case out of the statute of frauds.

The primary purpose of the statute of frauds "is to provide reliable evidence of the existence and the terms of the contract, the requirements of the statute can be met either by a single document or, as in this case, by a series of related writings which, taken together, describe the essential terms and conditions of the contract. *Vachon* v. *Tomascak*, 155 Conn. 52, 56–57, 230 A.2d 5 (1967); *Burns* v. *Garey*, 101 Conn. 323, 329, 125 A. 467 (1924); *Shelinsky* v. *Foster*, 87 Conn. 90, 97–98, 87 A. 35 (1913); Restatement (Second), Contracts § 208 (Tentative Draft 1973)." *Heyman* v. *CBS, Inc.*, 178 Conn. 215, 221, 423 A.2d 887 (1979); see also *Jacobs* v. *Thomas*, 26 Conn. App. 305, 310, 600 A.2d 1378 (1991), cert. denied, 221 Conn. 914, 603 A.2d 404 (1992). "The memorandum required by the statute is sufficient if it states the contract between the parties with such certainty that the essentials of the contract can be determined from the memorandum itself without the aid of parol proof, either by direct statement or by reference therein to some other writing or thing certain." *Vachon* v. *Tomascak*, supra, 57. "The memorandum of the contract need not be the contract itself . . . . The memorandum need not be made at the time of the contract; it may be made and signed afterward. . . . The moment written evidence of the contract under his hand, in whatever form, exists, the contract is taken out of the statute, citing Wood on Statute of Frauds, § 334. See 2 Corbin, Contracts § 503 (1950); Restatement (Second), Contracts § 214 (Tentative Draft 1973)." (Internal quotation marks omitted.) *Heyman* v. *CBS, Inc.*, supra, 222–23. Cross references to the agreement in documents can adequately demonstrate their interconnection. See id., 223.

On the basis of our review of the correspondence between the plaintiffs and the defendant, we conclude that the referee properly concluded that the series of letters was sufficient to take the agreement between the parties out of the statute of frauds.[2] The letters are evidence of an agreement between the parties in which the essential terms of the agreement are described, namely, if the plaintiffs continue in the employ of Sports Marketing for three years after the sale to Times Mirror, they each are to receive $100,000. The correspondence from the defendant was signed by him.

[2] A letter dated August 31, 1990, from Killion to the defendant included the following language:

"I would like to confirm our agreement for my compensation in regard to the sale and purchase agreement of Sports Marketing Group, Inc.

"In connection with the sale and purchase agreement of Sports Marketing Group, Inc., it is my understanding that an incentive compensation plan for the benefit of certain employees was constructed.

"Per your commitment to me in the press room at the 1989 U.S. Open Championship on Friday June 15, 1989, you agreed that you would pay $100,000 to me on or before your contract completion period date with Times Mirror Magazines Inc. This sum represents all of my efforts and hard work in helping to grow Sports Marketing Group, Inc. since 1981 and until the sale of the company by you to Times Mirror Magazine on June 14, 1989 and in consideration for remaining with the Times Mirror organization."

The defendant responded to Killion by letter dated September 24, 1990, which included the following language:

"The purpose of this letter is to respond to your correspondence dated August 31, 1990 concerning the sale of Sports Marketing Group, Inc. to Times Mirror Magazines.

"As you will recall, we had agreed that you and Brad Felenstein were to receive $100,000 each in 1992 from Times Mirror Magazines. To accomplish this, my wife and I directed a portion of the purchase price from ourselves to you and Brad. (This was done by discounting the $200,000 directed to the both of you and subtracting the present value of that amount form the purchase price [my wife] and I were due from Times Mirror Magazines; [Times Mirror] was to then pay you the full $200,000 as a deferred bonus approximately 3 years after the closing date of June 14, 1989.)"

By letter dated September 2, 1992, the defendant responded to an August 27, 1992 letter from Felenstein, which, in part, contained the following language:

"As you know, I never agreed to pay you $100,000 out of my own pocket. As you are well aware, I accepted less money for the sale of [Sports Marketing] upon Times Mirror Magazines' agreement to pay you $100,000 in 1992."

In addition, we have reviewed the stipulated agreement that ended the litigation in federal court, and agree with the referee's findings and conclusion with respect to the stipulation.[3] The stipulation is signed by the defendant and contains an escrow provision for the payment to the plaintiffs if they prevail in this action, and a provision in which the defendant released Times Mirror and Sports Marketing from liability to the plaintiffs in this action.

Because we conclude that there are sufficient writings to take the parties' oral agreement out of the statute of frauds, we need not reach the defendant's claim that the referee improperly concluded that the plaintiffs' performance of their three year obligation takes the case out of the statute of frauds.

II

The defendant's second claim is that the court failed to correct findings of fact in the referee's report. We need not address this issue on remand because one set of factual corrections requested by the defendant concerned his personal liability pursuant to the oral agreement. Our Supreme Court has resolved this issue in the plaintiffs' favor. *Killion* v. *Davis*, supra, 257 Conn. 98. The second set of facts concerns the plaintiffs' reliance on the defendant's representations to remain in the employ of Sports Marketing for three years after Times Mirror purchased the corporation. We need not address this claim because we determined in part I that the case was taken out of the statute of frauds by certain writings, and we therefore need not address the defendant's estoppel claim.

---

[3] The stipulation is subject to a confidentiality agreement and order of the Superior Court. We therefore do not disclose the specific terms of the stipulation.

## III

The defendant's final claim is that the court abused its discretion by affirming the referee's award of prejudgment interest to the plaintiffs pursuant to General Statutes § 37-3a. As a subordinate claim, the defendant argues that even if we conclude that the referee's award of prejudgment interest was proper, the referee's finding of June 15, 1992, as the date from which the interest is to be calculated is clearly erroneous. We do not agree.

Section 37-3a provides in relevant part that "interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable. . . ." "The allowance of prejudgment interest as an element of damages is an equitable determination and a matter lying within the discretion of the trial court. . . . Before awarding interest, the trial court must ascertain whether the defendant has wrongfully detained money damages due the plaintiff. . . . Interest on such damages ordinarily begins to run from the time it is due and payable to the plaintiff. . . . The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of an arbitrary rule." (Internal quotation marks omitted.) *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 734–35, 687 A.2d 506 (1997).

"[P]rejudgment interest is awarded in the discretion of the trial court to compensate the prevailing party for a delay in obtaining money that rightfully belongs to him. . . . The detention of the money must be determined to have been wrongful. . . . Its detention can only be wrongful, however, from and after the date on which the court, in its discretion, determines that the money was due and payable." (Citations omitted; inter-

nal quotation marks omitted.) *Northrop* v. *Allstate Ins. Co.*, 247 Conn. 242, 254–55, 720 A.2d 879 (1998).

"Under § 37-3a, an allowance of prejudgment interest turns on whether the detention of the money is or is not wrongful under the circumstances. . . . There are well established propositions that § 37-3a provides for interest on money detained after it becomes due and payable, that the question under the statute is whether the money was wrongfully withheld . . . . The statute, therefore, applies to claims involving the wrongful detention of money *after* it becomes due and payable.

"Prejudgment interest pursuant to § 37-3a has been applied to breach of contract claims for liquidated damages, namely, where a party claims that a specified sum under the terms of a contract, or a sum to be determined by the terms of the contract, owed to that party has been detained by another party." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Foley* v. *Huntington Co.*, 42 Conn. App. 712, 739–40, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996).

"[T]he determination of whether interest pursuant to § 37-3a should be awarded is a question for the trier of fact." Id., 738. "There is no doubt that case law has established that the commencement date for prejudgment interest is a factual determination. See, e.g., *Metcalfe* v. *Talarski*, 213 Conn. 145, 160, 567 A.2d 1148 (1989); *Spearhead Construction Corp.* v. *Bianco*, 39 Conn. App. 122, 134–35, 665 A.2d 86, cert. denied, 235 Conn. 928, 667 A.2d 554 (1995)." *Paulus* v. *LaSala*, 56 Conn. App. 139, 149, 742 A.2d 379 (1999), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000). As we noted at the beginning of this opinion, it is well known that appellate courts review factual findings under the clearly erroneous standard. *Killion* v. *Davis*, supra, 257 Conn. 101–102.

The facts reveal that prior to selling Sports Marketing to Times Mirror, the defendant sought out the plaintiffs individually and asked them to continue in the employ of Sports Marketing for three years following the sale. In return for three years of service, the plaintiffs were to receive $100,000 each. The defendant does not dispute that the agreement was made or that the plaintiffs have satisfied their part of the bargain. He disputed his personal liability for the $100,000 payments. The plaintiffs looked to the defendant for their money, and he informed them that they had to get it from Times Mirror. The manner in which the defendant structured the proceeds from the sale of his business and the escrow provisions in the stipulated judgment indicate that the defendant himself acknowledged that the plaintiffs were each due $100,000 in June, 1992. Despite the fact that the defendant was obligated to pay the plaintiffs, he did nothing to pay or to secure for the plaintiffs the benefit of their bargain. His failure to see that the plaintiffs timely received what was rightfully theirs was wrongful. Furthermore, the plaintiffs were entitled to payment on June 15, 1992, when they fulfilled their part of the bargain. Because the defendant wrongfully withheld the moneys owed the plaintiffs at the time they were payable, § 37-3a provides that the plaintiffs are entitled to prejudgment interest from June 15, 1992.

We conclude that the referee acted well within his discretion when he determined that the defendant wrongfully withheld payment from the plaintiffs and that the plaintiffs were entitled to prejudgment interest pursuant to § 37-3a from June 15, 1992. The court therefore properly rendered judgment on the referee's report. Under the circumstances of this case, justice was served in accordance with the purpose of § 37-3a.

The judgment is affirmed.

In this opinion the other judges concurred.