ADVANCED FINANCIAL SERVICES, INC. *v.*
ASSOCIATED APPRAISAL SERVICES,
INC., ET AL.
(AC 22219)

Lavery, C. J., and West and Stoughton, Js.

Argued April 28—officially released August 26, 2003

*Michael F. Dowley*, with whom was *Jennifer A. Bernazani*, for the appellants-cross appellees (named defendant et al.).

*Thomas P. Wilcutts*, with whom were *Jeffrey R. Martin* and, on the brief, *Douglas A. Cho*, for the appellee-cross appellant (plaintiff).

*Opinion*

LAVERY, C. J. The defendants Associated Appraisal Services, Inc., and Garry R. Brooke[1] appeal and the

---

[1] The three defendants in the plaintiff's initial complaint were Associated Appraisal Services, Inc., Brooke and Stephen G. Shore. The plaintiff subsequently withdrew the action as against Shore on April 11, 2001. We therefore refer in this opinion to Associated Appraisal Services, Inc., and to Brooke as the defendants.

plaintiff, Advanced Financial Services, Inc., cross appeals from the judgment of the trial court awarding the plaintiff $591,418 plus attorney's fees and costs. On appeal, the defendants claim that the court improperly (1) admitted into evidence an incomplete contract, (2) calculated damages, (3) failed to address their special defense of improper reliance, (4) denied their discovery request for a policy manual, (5) precluded them from conducting voir dire of a plaintiff's witness, (6) precluded them from presenting expert testimony, (7) applied the wrong statute of limitations and (8) denied their motion to disqualify the trial judge. The plaintiff claims in its cross appeal that the court improperly calculated compensatory damages. We affirm the judgment of the trial court.

The following undisputed facts were found by the court. "In early 1995, the plaintiff agreed to make a mortgage loan to Frank S. Sottile, who was purchasing a home then owned by one Kenneth Assad. The home was then under construction in Southington. The loan was to be in the amount of $650,000. The plaintiff contemplated selling the loan to Countrywide Funding Corp. (Countrywide). According to its own practice and as required by Countrywide, the plaintiff, in May, 1995, hired the [defendants] to appraise the property. The appraisal was done by Stephen G. Shore, an independent contractor, who reported the results to [Brooke, the president of the defendant corporation]. An appraisal report was issued by the defendants, purportedly signed by Shore and [Brooke], but in actuality, signed only by Brooke.

"The report assigned a value of $1,100,000 to the property 'subject to completion per plan and specifications.' Prior to closing the loan, the plaintiff asked Brooke to reinspect the property because it could not close the loan unless construction was completed. In response to this request, the defendant Brooke again

asked Shore to inspect the property. Shore revisited the premises and observed that not only had no further work been done, but also that the property had been damaged by vandalism. He reported his findings to Brooke.

"Notwithstanding this report, Brooke prepared, signed and delivered to the plaintiff a document entitled 'Satisfactory Completion Certificate' (completion certificate), which contained the following recital: 'I certify that I have reinspected subject property, the requirements or conditions set forth in the appraisal report have been met, and any required repairs or completion items have been done in a workmanlike manner.' The report, purportedly signed also by Shore, was in fact signed only by Brooke who, without authorization, signed Shore's name.

"Relying on the appraisal, [the plaintiff] closed the loan on June 2, 1995, in the amount of $650,000. It thereupon assigned the mortgage to Countrywide. By agreement, [the plaintiff] fully guaranteed the loan to Countrywide. Brooke claimed at trial that [the plaintiff] knew the property was not completed, but told him to send [it] the satisfactory completion certificate notwithstanding. Later in 1995, the Sottile loan went into default. The plaintiff asked Countrywide to handle the foreclosure action, which it did. The judgment obtained found a debt due the plaintiff of $722,646.30 and a fair market value of the property in the amount of $552,000. The plaintiff duly watched over the property and the foreclosure action. Pursuant to its agreement with Countrywide, [the plaintiff] repurchased the loan and paid Countrywide a negotiated sum of $461,499.58, although Countrywide had claimed a loss of $544,091.25." The negotiated sum was the result of an agreement entered into between the plaintiff and Countrywide resolving several outstanding debts the plaintiff owed Countrywide, including the Sottile loan. The court

also found that title vested in the plaintiff on May 26, 1996.

The plaintiff brought an amended four count complaint against the defendants, alleging negligence, breach of contract, fraud and recklessness, and, finally, a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The defendants raised the following five special defenses: (1) statute of limitations, (2) failure to mitigate, (3) contributory negligence, (4) collateral estoppel and (5) improper reliance. The court found in favor of the plaintiff on each count and awarded $591,418 in damages plus attorney's fees and costs. These appeals followed. Additional facts will be set forth as necessary.

I

The defendants' first claim is that the court improperly admitted into evidence as a full contract only a portion of that contract. Specifically, the defendants argue that the court failed to require the production of a manual that was referenced in the contract. We disagree.

The following additional facts are necessary for the resolution of the defendants' claim. The court admitted into evidence a loan purchase agreement (agreement) between Countrywide and the plaintiff dated January 16, 1990, which outlined the parties' respective rights and obligations to each other when purchasing and selling loans. That agreement makes reference to Countrywide's correspondent lending division loan purchase program seller's manual (manual) that sets forth additional terms, conditions and procedures. On April 6, 2001, four days before trial began, the defendants asked the court to order the plaintiff to produce the manual. The plaintiff informed the court that neither it nor Countrywide had the manual as it existed in 1995, but that there was a 2001 version on Countrywide's Internet

web site. The court ordered the plaintiff to access the 2001 manual and to provide the defendants with any material concerning the completion certificate. On April 17, 2001, the plaintiff informed the court that it had provided the defendants with those portions of the manual before trial began. The defendants did not dispute that assertion.

The defendants, at trial, objected to the agreement's being admitted into evidence because it was incomplete due to the absence of the manual. The plaintiff argued that the agreement had been authenticated and identified by Dennis F. Hardiman, the chief executive officer of the plaintiff corporation, and that questions pertaining to the manual were a proper subject for cross-examination, but did not concern the agreement's admissibility. The court informed the defendants that the agreement might become worthless after cross-examination concerning the absence of the manual, but that its absence alone did not make the agreement inadmissible. The court then overruled the defendants' objection.

The defendants argue that the court admitted the agreement as a full contract without requiring the plaintiff to introduce the manual. According to the defendants, the agreement was incomplete without the manual. The defendants contend that they were harmed by the court's ruling because the plaintiff was allowed to bring an action on an incomplete agreement, their ability to challenge the plaintiff's claim of damages was impaired and they were prohibited from effectively raising their special defense of contributory negligence.

We first set forth our standard of review. "We have generally held that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear

abuse of the court's discretion. . . . Additionally, before a party is entitled to a new trial because of an erroneous evidentiary ruling, [it] has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Citation omitted; internal quotation marks omitted.) *Urich* v. *Fish*, 261 Conn. 575, 580–81, 804 A.2d 795 (2002).

The defendants cite § 1-5 (a) of the Connecticut Code of Evidence in support of their claim. That section provides that "[w]hen a statement is introduced by a party, the court may, and upon request shall, require the proponent at that time to introduce any other part of the statement, whether or not otherwise admissible, that the court determines, considering the context of the first part of the statement, ought in fairness to be considered contemporaneously with it." Even if we assume, without deciding, that this evidentiary section applies to written contracts and does not implicate the parol evidence rule, the fatal flaw in the defendants' argument is that the manual that was in place in 1995 no longer existed. Neither the plaintiff nor Countrywide had that manual. The court did order the plaintiff to produce a portion of the 2001 manual relevant to the completion certificate, which the plaintiff did.

The defendants were not precluded in any way from cross-examining the witness on the absence of the manual. The defendants did not object at trial to the agreement on any other ground such as relevance or lack of authentication. We therefore conclude that the court did not abuse its discretion in admitting the agreement into evidence.

II

The defendants next raise several claims concerning the court's award of damages. We will address each in turn.

## A

The defendants' first claim regarding damages is that the court improperly awarded prejudgment interest pursuant to General Statutes § 37-3a. Specifically, the defendants argue that the court should not have awarded prejudgment interest because there was no evidence that any money was due and payable to the plaintiff by the defendants or that any detention of money owed had been withheld wrongfully. Additionally, the defendants argue that the court improperly determined that prejudgment interest began to accumulate on the date title to the property vested with the plaintiff when there was no evidence that they were aware that they owed money to the plaintiff on that date. We disagree.

In its memorandum of decision, the court simply stated "that the plaintiff is lawfully entitled to prejudgment interest pursuant to § 37-3a." Section 37-3a provides in relevant part that "interest at the rate of ten percent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable." The court stated: "The damages in this case became liquidated on November 26, 1996, the day that title vested in the plaintiff. The defendants undoubtedly knew of their wrongdoing at that time. They made no effort to pay the damages and have steadfastly continued such refusal throughout these proceedings. The court finds those damages of $170,646.30 wrongfully withheld. Interest is therefore due the plaintiff from November 26, 1996, until the date of this judgment at the rate of 10 percent a year." The court found that the total interest due was $79,479.10.

"The allowance of prejudgment interest as an element of damages is an equitable determination and a matter lying within the discretion of the trial court. . . .

Before awarding interest, the trial court must ascertain whether the defendant has wrongfully detained money damages due the plaintiff. . . . Interest on such damages ordinarily begins to run from the time it is due and payable to the plaintiff. . . . The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of an arbitrary rule." (Internal quotation marks omitted.) *Killion* v. *Davis*, 69 Conn. App. 366, 375, 793 A.2d 1237, cert. denied, 260 Conn. 931, 799 A.2d 295 (2002). "It is clear that Connecticut case law establishes that prejudgment interest is to be awarded if, in the discretion of the trier of fact, equitable considerations deem that it is warranted." (Internal quotation marks omitted.) *Hoye* v. *DeWolfe Co.*, 61 Conn. App. 558, 564, 764 A.2d 1269 (2001). "It is . . . well established that we will not overrule the trial court's award of interest absent a clear abuse of discretion." (Internal quotation marks omitted.) *Fitzpatrick* v. *Scalzi*, 72 Conn. App. 779, 788, 806 A.2d 593 (2002).

"A trial court must make two determinations when awarding compensatory interest under § 37-3a: (1) whether the party against whom interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which interest should be calculated." (Internal quotation marks omitted.) *Maloney* v. *PCRE, LLC*, 68 Conn. App. 727, 755, 793 A.2d 1118 (2002). Factual findings, such as those determinations, are reviewed under the clearly erroneous standard of review. See *Tuxis-Ohr's, Inc.* v. *Gherlone*, 76 Conn. App. 34, 38, 818 A.2d 799, cert. denied, 264 Conn. 907, 826 A.2d 179 (2003). "A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the defi-

nite and firm conviction that a mistake has been made. . . . Simply put, we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Internal quotation marks omitted.) Id., 38–39.

The court's conclusion that the defendants wrongfully detained money due to the plaintiff is supported by the evidence. The defendants knew that the building was incomplete and still sent in a false and misleading completion certificate indicating that all construction had been finished. The court, after hearing the witnesses testify and after weighing and interpreting the evidence, determined that the defendants knew their false and misleading completion certificate would cause the plaintiff damages. By not compensating the plaintiff for the damages it sustained after the foreclosure of the property that was supposed to secure the loan, the defendants wrongfully detained the plaintiff's money. That conclusion by the court, therefore, was not clearly erroneous.

The defendants do not contest the court's determination of the date that title vested with the plaintiff. Rather, the defendants claim that the starting date for calculating interest was inappropriate because they had no knowledge of the foreclosure. The defendants fail to cite any authority for their contention that they had to know of the foreclosure. The evidence supports the court's finding that the defendants knew of their misrepresentation and negligent completion certificate on the date they issued the document. Inferred from that fact is that the defendants were aware that the plaintiff could potentially suffer harm from that date onward. Obviously, the defendants knew that if the property was overvalued, the loan would be undersecured and that, if there was a foreclosure, the plaintiff would and did suffer damages.

Accordingly, we conclude that the court did not abuse its discretion in awarding prejudgment interest because the court's finding of facts were not clearly erroneous.

## B

The defendants' second damages claim is that the court improperly awarded the plaintiff punitive damages in the amount of $341,292.60. Specifically, the defendants argue that the award was excessive and in violation of the court's discretion. We are not persuaded.

The court awarded punitive damages to the plaintiff for the defendants' violation of CUTPA. The defendants violated CUTPA by submitting the completion certificate when they knew that the construction had not been completed, by failing to disclose to the plaintiff that vandalism had occurred on the property and by signing Shore's name without Shore's permission or knowledge. The court determined the amount of punitive damages to be awarded by utilizing the method of doubling the amount of actual or compensatory damages. In doing so, the court cited *Bailey Employment System, Inc.* v. *Hahn*, 545 F. Sup. 62, 73 (D. Conn. 1982), aff'd, 723 F.2d 895 (2d Cir. 1983).

General Statutes § 42-110g provides in relevant part that "[a]ny person who suffers any ascertainable loss of money or property . . . as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."

"[A]warding punitive damages . . . under CUTPA is discretionary . . . and the exercise of such discretion will not ordinarily be interfered with on appeal unless the abuse is manifest or injustice appears to have been

done. . . . [T]o award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.) *Tanpiengco* v. *Tasto*, 72 Conn. App. 817, 820–21, 806 A.2d 1080 (2002). "While the CUTPA statutes do not provide a method for determining punitive damages, courts generally award punitive damages in amounts equal to actual damages or multiples of the actual damages." *Perkins* v. *Colonial Cemeteries, Inc.*, 53 Conn. App. 646, 649, 734 A.2d 1010 (1999).

The defendants do not contest the court's conclusion that their conduct evidenced a reckless indifference to the rights of the plaintiff. Rather, their contention is with the amount of money awarded. We conclude that the court did not abuse its discretion in awarding punitive damages under CUTPA by doubling the compensatory damages of $170,646.30.

C

The defendants' third claim concerning damages is that the court failed to take into account the property's decrease in fair market value due to vandalism, which constituted an intervening cause of harm beyond the scope of the defendants' duty to the plaintiff. We disagree.

The court determined that compensatory damages were limited to $170,646.30. That number was reached by taking the debt the foreclosure court found of $722,646.30 minus the fair market value of the property when title vested with the plaintiff, which was $552,000. The court stated in its memorandum of decision that "there is no evidence as to what, if any, reduction in fair market value was assigned at judgment because of vandalism." The defendants contend, however, that the evidence produced at trial did establish the damages caused by vandalism. Specifically, the defendants refer

to an appraisal conducted at the time of the foreclosure that noted a depreciation in physical conditions of the property in the amount of $39,948. The defendants also reference a letter from Countrywide to the plaintiff detailing its losses. In that letter, there is an entry for "Loss Draft Proceeds Received" in the amount of $58,672.87, which the defendants contend is the amount Countrywide received from an insurance company to compensate for vandalism.[2] Finally, the defendants argue that a document from Mattatuck Construction Company provides a detailed list of the repair work that had to be done on the property.

The defendants' claim attacks a finding of fact, albeit a finding of the absence of a fact, which we review under the clearly erroneous standard of review. See *Tuxis-Ohr's, Inc.* v. *Gherlone*, supra, 76 Conn. App. 38. Here, the court was correct that there was no evidence concerning the amount of damage, if any, vandalism caused to the property that would reduce its fair market value. The appraisal report the defendants rely on does not state that the physical depreciation was due to vandalism. The Countrywide letter does indicate that loss draft proceeds were received, but there was no evidence produced at trial that indicated those were proceeds from an insurance company to compensate for vandalism. Finally, the itemized repair list simply indicates construction that was necessary to complete the residential dwelling on the property. On that list, there was no evidence that indicated that any specific item was necessary because of vandalism. Accordingly, we conclude that the court's finding that there was no evidence of the amount of damages attributable to vandalism was not clearly erroneous.

[2] That assertion by the defendants is supported only by a footnote in the plaintiff's posttrial brief. No evidence of that assertion was produced to the court during trial.

D

The defendants' fourth claim relating to the award of damages is that the court improperly awarded punitive damages on the plaintiff's claim of recklessness, which was not alleged or properly pleaded in the complaint. Specifically, the defendants argue that the court could not award punitive damages on count three of the complaint because that count contained the exact same factual allegations as count one, which was a claim of negligence. We disagree.

Although the defendants frame the issue as an improper award of damages, it actually is a claim that the court improperly denied their motion to strike the recklessness count. On September 9, 1998, the defendants filed a motion to strike, claiming, inter alia, that count three should be dismissed because it alleged the same factual allegations as did count one, which was a claim of negligence. The motion was denied on November 16, 1998. The defendants, therefore, claim that no damages can be awarded on count three because that count should have been stricken.

In its amended complaint dated May 21, 2001, the plaintiff alleged in count one that the defendants acted negligently in preparing the completion certificate by breaching their duty of reasonable skill, care and diligence. The plaintiff alleged that the defendants breached the standard of care by failing to notify it that construction was not completed, failing to conduct a proper inspection to determine whether construction was complete, and failing to use the level of skill and care of real estate appraisers in advising the plaintiff on the value of the property.

In count three, the plaintiff incorporated the factual allegations in count one, but did not incorporate the paragraph detailing how the defendants were negligent. Rather, the plaintiff alleged: "The representations set

forth in the defendant's Satisfactory Completion Certificate regarding the state of completion of construction and repairs for the residential structure on the Property were false and were made by the defendants with the knowledge that they were false or with a reckless disregard as to whether or not they were true or false." The court in its memorandum of decision determined that count three alleged a cause of action for recklessness.

"Our standard of review is undisputed. Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on [a motion to strike] is plenary." (Internal quotation marks omitted.) *Melanson* v. *West Hartford*, 61 Conn. App. 683, 687, 767 A.2d 764, cert. denied, 256 Conn. 904, 772 A.2d 595 (2001). "On a motion to strike, the trial court's inquiry is to ascertain whether the allegations in each count, if proven, would state a claim on which relief could be granted." (Internal quotation marks omitted.) *In re Michael D.*, 58 Conn. App. 119, 122, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000). "[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly, rather than narrowly." (Citation omitted; internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 629, 804 A.2d 180 (2002).

To determine whether the plaintiff's amended complaint stated a cause of action sounding in recklessness, we look first to the definition of reckless behavior. "Recklessness is a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there

must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . [R]eckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. . . . It is at least clear . . . that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention . . . ." (Citations omitted; internal quotation marks omitted.) *Craig* v. *Driscoll*, 64 Conn. App. 699, 720–21, 781 A.2d 440 (2001), aff'd, 262 Conn. 312, 813 A.2d 1003 (2003). "It is well established that causes of action for negligence and [recklessness] are separate and distinct causes of action. There is a substantial difference between negligence and [reckless] conduct, and a complaint should employ language explicit enough to inform the court and opposing counsel clearly that [reckless] conduct is being asserted." *Warner* v. *Leslie-Elliot Constructors, Inc.*, 194 Conn. 129, 138, 479 A.2d 231 (1984).

Here, the plaintiff specifically alleged a recklessness cause of action. The plaintiff stated that the defendants knew the completion certificate was false, knew that the plaintiff would rely on it in making the loan, and submitted a false and misleading report with a reckless disregard for the truth of the certificate or the rights of the plaintiff. We conclude, therefore, that count three alleged a cause of action in recklessness and that the court properly awarded punitive damages on that count.

E

The defendants' fifth damages claim is that the court improperly awarded punitive damages twice on the CUTPA claim. That claim is without merit.

The court in its memorandum of decision awarded $341,292.60 in punitive damages on the CUTPA claim and in a subsequent hearing awarded $128,000 in attorney's fees on the CUTPA claim. The court did not award double punitive damages, but made two separate and distinct awards. Section 42-110g expressly allows for the award of punitive damages *and* attorney's fees. Section 42-110g (a) allows the court to award punitive damages, and § 42-110g (d) provides in relevant part that "the court may award, to the plaintiff, *in addition to the relief provided in this section,* costs and reasonable attorneys' fees . . . ." (Emphasis added.) We conclude, therefore, that the court properly awarded both punitive damages and attorney's fees on the CUTPA claim.

### III

The defendants' third claim is that the court failed to address their special defense of improper reliance on the appraisal. Specifically, the defendants argue that the court did not comply with Practice Book § 6-1 (a) because it did not address the defendants' fifth special defense or its factual basis. We decline to review that claim.

"Our rules regarding the need to seek an articulation of the factual basis of the trial court's decision are well settled. It is the responsibility of the appellant to move for an articulation in order to clarify the basis of the trial court's decision should such clarification be necessary for effective appellate review of the issue on appeal. . . . It is, therefore, the responsibility of the appellant to move for an articulation or clarification of the record when the trial court has failed to state the basis of a decision." (Citations omitted.) *Zahringer* v. *Zahringer*, 262 Conn. 360, 370, 815 A.2d 75 (2003). "[W]here the trial court's decision is ambiguous, unclear or incomplete, an appellant must seek an articulation

. . . or this court will not review the claim." (Citation omitted.) *Hunter's Ambulance Service, Inc.* v. *Shernow*, 70 Conn. App. 96, 113, 798 A.2d 991 (2002).

Here, the defendants have not provided this court with an adequate record. The defendants did not file any motion for articulation pursuant to Practice Book § 66-5 asking the trial court to address or to state its reasons for not finding in favor of the defendant on its fifth special defense. The defendants have failed to utilize the procedural vehicles available to remedy the inadequacies in the record, yet urge us to resolve the deficiencies in the memorandum of decision on direct appeal. We decline to do so. See *Reader* v. *Cassarino*, 51 Conn. App. 292, 295–97, 721 A.2d 911 (1998).

IV

The defendants' fourth claim is that the court improperly failed to order the production of the policy manual in effect in 1995 that was referenced in the 1990 loan purchase agreement between the plaintiff and Countrywide. Specifically, the defendants argue that the manual was material and relevant because it was incorporated into the loan purchase agreement and related to their defense of contributory negligence. We are not persuaded.

The defendants assert that they asked for the manuals through various interrogatories and requests for production that were served on the plaintiff.[3] The plaintiff

---

[3] Those interrogatories and requests for production, however, were not produced by the defendant in the record on appeal. We do have before us the plaintiff's objections to certain requests for production, including interrogatory four, which states: "Please identify each and every document used by the Plaintiff in the loan application and approval process by the Plaintiff during the time period from January 1, 1995, through July 1, 1995." The defendants' request for production number nine states: "Produce all documents related to the sale of the [Sottile] loan . . . ." The defendants' request for production number twelve states: "Produce all documents related to the alleged errors and inaccuracies in the Defendants' appraisal . . . ."

objected to several of the requests, but the court did not rule on the objections. In a letter dated February 21, 2001, the defendants asked the plaintiff for a copy of the loan purchase agreements with Countrywide of January 16, 1990, and July 11, 1995, and any other documents relating specifically to the plaintiff's repurchase of the Sottile loan. The plaintiff responded to the defendants in a letter dated February 22, 2001, and stated that it was providing the defendants with all the documents Countrywide had provided to the plaintiff, copies of the loan purchase agreements and copies of documents relating to the repurchase of the Sottile loan.

On March 12, 2002, the defendants filed a motion for nonsuit or sanctions pursuant to Practice Book § 13-14. In that motion, the defendants claimed that the plaintiff had failed to comply with its requests because the loan purchase agreements referenced the policy manual, which was not produced. The plaintiff filed an objection to the defendants' motion for nonsuit or sanctions on March 28, 2001. The plaintiff claimed that it had complied in good faith with all discovery obligations and that failure to produce the manual was due to the fact that it did not possess the manual as it existed in 1995. One reason for the absence was that the 1995 manual had become obsolete. The plaintiff further asserted that it has no control over Countrywide and could not search Countrywide's files to see if Countrywide had the obsolete manuals from 1995. The plaintiff did contact Countrywide and asked for the 1995 manual, but was informed that Countrywide could not provide a copy because it was obsolete and no longer in effect.

On April 6, 2001, the court heard arguments on the defendants' motion for nonsuit or sanctions, which the court denied. The defendants argued that the manuals were relevant, material and necessary to the issues in the case. The plaintiff disagreed with the defendants,

but asserted once again that it did not possess the 1995 manual. The plaintiff informed the court that there existed a 2001 manual on Countrywide's Internet site. The court ordered the plaintiff to access that manual to see if there was any information pertaining to the completion certificate. The plaintiff informed the court on April 17, 2001, that it did provide such information to the defendants before trial.

"With respect to the appropriate standard of review, Practice Book § 13-14 (a) provides in relevant part that a trial court may, on motion [to compel production], make such order as the ends of justice require. Consequently, the granting or denial of a discovery request rests in the sound discretion of the court . . . and can be reversed only if such an order constitutes an abuse of that discretion. The ultimate issue in our review is, therefore, whether the trial court reasonably could have concluded as it did." (Internal quotation marks omitted.) *Berglass* v. *Berglass*, 71 Conn. App. 771, 786, 804 A.2d 889 (2002).

Here, the defendants do not challenge the court's denial of its motion for nonsuit or sanctions, but rather the court's failure to compel the plaintiff to produce the 1995 manual. Neither the plaintiff nor Countrywide possessed the 1995 manual. The court ordered the plaintiff to disclose any portion of the 2001 manual that was relevant to the completion certificate, which the plaintiff claimed it did and had produced before trial. The defendants did not object to or contest that assertion. Accordingly, we conclude that the court did not abuse its discretion in failing to compel the plaintiff to produce a document that neither it nor Countrywide possessed.

V

The defendants' fifth claim is that the court improperly precluded them from conducting a voir dire of

Hardiman concerning exhibits that were introduced through him. Specifically, the defendants argue that the court abused its discretion in precluding voir dire on the admissibility of exhibits that were material to the case and which impaired their ability to defend against the plaintiff's claims adequately. We decline to review that claim.

The plaintiff called Hardiman as its first witness. During the direct examination, the plaintiff introduced into evidence five exhibits. Before any of the exhibits were admitted into evidence, the defendants sought and were granted permission to voir dire the witness. On the last such occasion, the court stated: "I'm not going to allow you to examine [Hardiman] anymore because you have been cautioned time and time again that you're asking questions that are inappropriate for voir dire." After that ruling, several other exhibits were introduced through Hardiman. The defendants did not ask the court for permission to voir dire Hardiman on those exhibits.

The defendants merely cite an evidentiary treatise in support of their claim. That treatise states in relevant part: "In deciding whether or not to object to testimony or exhibits, opposing counsel is entitled to a preliminary inquiry into the factual or legal prerequisites for admission of such evidence. Examples of matters appropriate for such examination are the competency of witnesses . . . qualifications of experts, authenticity of documents or exhibits and similarity of conditions." C. Tait, Connecticut Evidence (3d Ed. 2001) § 1.29.2, p. 84. The defendants provide no case law or analysis to support their claim. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . We will not review claims absent law and analysis." (Internal quotation marks omitted.) *Wachter* v.

*UDV North America, Inc.*, 75 Conn. App. 538, 545–46, 816 A.2d 668 (2003). Because the defendants' brief is inadequate, we deem their claim abandoned and decline to afford it review.

## VI

The defendants' next claim is that the court improperly precluded their experts from testifying at trial. Specifically, the defendants argue that their experts had been disclosed properly pursuant to the rules of practice.[4] We disagree.

A scheduling order was issued on November 8, 2000, by an attorney trial referee, requiring that the defendants disclose their experts by December 23, 2000. Implicit in that order was that the disclosure comply with the rules of practice. In two separate pleadings dated December 22, 2000, the defendants disclosed two expert witnesses pursuant to Practice Book § 13-4 (4). The two experts were Gary Schiller and Stuart Greenberg. Both witnesses would testify about "[t]he duties, obligations, and standard of care for commercial and residential lenders in the state of Connecticut and the [p]laintiff's breach of said duties and obligations and [the] standard of care with respect to the transaction which is the subject of this lawsuit." The substance of the facts and opinions of the expert testimony according to the disclosure was that the plaintiff had "violated [its] responsibilities and the applicable standard of care for mortgage lenders and brokers in the state of Connecticut, in connection with lending funds for the purchase of the property at 510 Mount Vernon Road in Southington, Connecticut which is the subject

---

[4] The defendants also claim that the court improperly precluded their experts' testimony in that the subject matter of that testimony was relevant to the issues at trial. The court's decision, however, to preclude the experts was not based on relevance, but on the defendants' failure to comply with the rules of practice.

of this lawsuit [and] [t]hat in connection with lending funds to purchase said property the [plaintiff] failed to properly determine the borrower's ability to repay the loan; failed to determine whether or not said property had been issued a certificate of occupancy and failed to comply with the standards of care required of mortgage brokers and lenders prior to issuing a loan."

On March 30, 2001, the plaintiff filed a motion to preclude the defendants' expert witnesses on the ground that the defendants had violated Practice Book § 13-4 (4). The defendants articulated for the first time before the court on April 6, 2001, that their experts would be testifying about the standard of care with regard to the completion certificate. The court, after hearing argument from both parties, precluded the defendants' experts from testifying at trial because of the defendants' improper disclosure. The court explained that the disclosures did not provide the plaintiff with any idea of what the experts would testify about and that the disclosure actually led the plaintiff astray of what the experts would testify about. The court stated: "If we had a lot of time in this case, I [would allow the defendants to] amend your disclosure, let [the plaintiff] take the deposition . . . . We're out of time. We don't have that time, it's gone. Now I have to make a decision of what's fair for this trial. I realized that if [the defendants do not] put [their] expert on . . . [they] may be hurt in this case. And if I do let you put it on, he is going to be hurt because [the plaintiff] has no answer to that. [The plaintiff] hasn't had time to do it." The court explained that the defendants had never informed the plaintiff about what subject the experts would testify and that the disclosure was not specific enough. That, the court concluded, was not in accordance with Practice Book § 13-4 (4) because the subject matter and substance of the facts and opinions were not even remotely in the disclosure.

"In order for a trial court's order of sanctions for violation of a discovery order to withstand scrutiny, three requirements must be met. First, the order to be complied with must be reasonably clear. In this connection, however, we also state that even an order that does not meet this standard may form the basis of a sanction if the record establishes that, notwithstanding the lack of such clarity, the party sanctioned in fact understood the trial court's intended meaning. This requirement poses a legal question that we will review de novo. Second, the record must establish that the order was in fact violated. This requirement poses a question of fact that we will review using a clearly erroneous standard of review. Third, the sanction imposed must be proportional to the violation. This requirement poses a question of the discretion of the trial court that we will review for abuse of that discretion." (Internal quotation marks omitted.) *ARB Construction, LLC* v. *Pinney Construction Corp.*, 75 Conn. App. 151, 162, 815 A.2d 705 (2003). We conclude that all three requirements have been satisfied.

First, the order with which the defendants were required to comply was reasonably clear, and the defendants knew that in complying with the order they had to comply with Practice Book § 13-4 (4). The November 8, 2001 scheduling order stated that the defendants had to disclose their experts by December 23, 2001. In disclosing their experts, the defendants had to comply with Practice Book § 13-4 (4), which provides in relevant part that a party shall "disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. . . ."

Second, the record demonstrates that the defendants violated Practice Book § 13-4 (4). The defendants' dis-

closure of their experts discussed the subject matter on which the experts were to testify, the substance and facts of their opinion, and the summary of the grounds for their opinion in general, all encompassing and vague terms. Furthermore, in argument before the court on April 6, 2001, the defendants first expressed the true subject matter of their experts' testimony, that being the standard of care regarding the completion certificate. That was not specified in the defendants' disclosure. The court's finding that Practice Book § 13-4 (4) was not complied with, therefore, was not clearly erroneous.

Finally, the sanction of precluding the defendants' experts from testifying was proportional to the violation and did not constitute an abuse of discretion. The defendants for the first time indicated the true subject matter of their experts' opinion on April 6, 2001. That violated the rules of practice pertaining to disclosure. Evidence began on April 10, 2001. The complaint had been in existence since May, 1998. The experts were known on December 22, 2000, yet the defendants waited until April 6, 2001 to fully comply with the rules. The court in its ruling noted that the plaintiff's disclosed expert would not able to rebut or to testify on the standard of care regarding the certificate of completion. A continuation of the trial to allow the plaintiff to depose the defendants' experts, to find an expert to rebut the defendants' experts, and to have that expert deposed would cause undue prejudice to the plaintiff at that late stage of the trial and would cause undue interference with an action that had gone on for almost three years. See Practice Book § 13-4 (4) (A) and (B). We therefore conclude that the court did not abuse its discretion in precluding the defendants' experts from testifying at trial.

## VII

The defendants' seventh claim is that the court improperly applied the wrong statute of limitations.

Specifically, the defendants argue that the court should have applied General Statutes § 52-584 in calculating the statute of limitations instead of General Statutes § 52-577. We decline to review that claim.

"We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . We will not review claims absent law and analysis." (Internal quotation marks omitted.) *Wachter* v. *UDV North America, Inc.*, supra, 75 Conn. App. 545–46. The defendants simply reproduced the language of §§ 52-584 and 52-577 in their brief to this court. The defendants cited a two step test that was employed in a Superior Court case, but do not explain what that test is or how it is applicable to the facts here.

The defendants also do not cite any appellate authority for their bare assertion that the court improperly applied the wrong statute of limitations. The defendants argue, without any legal support or analysis, merely that the corporation is a "person" under § 52-584, that it was damaged by purely commercial losses and that the plaintiff's "property," both real and personal, was injured because of the simple fact that the plaintiff suffered monetary loss. In addition, absent from the defendants' brief is any reference to which count, if any, that argument is applicable. Accordingly, we decline to review that claim.

## VIII

The defendants' final claim is that the judge improperly failed to recuse himself. Specifically, the defendants argue that a judge who presides over pretrial settlement conferences or is aware of confidential settlement offers must disqualify himself because of the appearance of impropriety. We disagree.

The following additional facts are necessary for the resolution of that claim. On November 8, 2000, an attorney trial referee issued an alternative dispute resolution form, which was placed in the court file. That form indicated in part that the plaintiff's demand was for $400,000. It also had an entry for "offer," which was filled in as not applicable. On April 10, 2001, the defendants filed in court a motion for disqualification of the judicial authority pursuant to Practice Book § 1-23. The basis of the defendants' motion was that on April 4, 2001, during a discussion over scheduling, the judge stated that he was aware that the settlement offer from the defendants was zero and that the plaintiff's settlement offer was approximately $400,000. That discussion was not in open court, nor was it recorded. We therefore do not have a transcript before us on appeal concerning what the judge stated. In addition, the defendants argue that the judge stated on the record on April 6, 2001, during argument on various outstanding motions, that he was surprised that the plaintiff was limiting its claim to the $400,000 amount. We have reviewed the transcript of April 6, 2001, and the judge made no such representation. Those two remarks, the defendants contend, violated canon 3 (c) of the Code of Judicial Conduct.

The court denied the defendants' motion for disqualification on April 11, 2001. The court indicated that it had not been involved in the settlement negotiations, but did read the attorney trial referee's report in the court file. The court explained that its reference to monetary figures on April 6, 2001, was used hypothetically to legal arguments and possible claims in the case, but did not concern settlement offers or the merits of the case. The court also stated that even if the defendants' motion had merit, the defendants had waived any claim because they waited until the court ruled unfavorably on their motions.

"The standard for appellate review of whether the facts require disqualification is whether the court's discretion has been abused." *Joyner* v. *Commissioner of Correction*, 55 Conn. App. 602, 609, 740 A.2d 424 (1999). "Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances." (Internal quotation marks omitted.) *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 820, 717 A.2d 1232 (1998).

"A factual basis is necessary to determine whether a reasonable person, knowing all of the circumstances, might reasonably question the trial judge's impartiality. Vague and unverified assertions of opinion, speculation and conjecture cannot support a motion to recuse . . . ." (Internal quotation marks omitted.) *State* v. *Montini*, 52 Conn. App. 682, 695, 730 A.2d 76, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999). "It is a fundamental principle that to demonstrate bias sufficient to support a claim of judicial disqualification, the due administration of justice requires that such a demonstration be based on more than opinion or conclusion." (Internal quotation marks omitted.) Id., 695–96.

Here, the defendants made two factual assertions that are not supported by the record before us. We do not have a transcript of the April 4, 2001 meeting, and the April 6, 2001 hearing is devoid of the statement the defendants assert the judge made. Furthermore, the

judge was not involved in the settlement negotiations at all, but merely saw an entry on the attorney trial referee's report in the court file that the damages being sought were $400,000. The court also did not express an opinion as to the value of the case. We conclude, therefore, that the court did not abuse its discretion in denying the defendants' motion to disqualify.

## IX

The plaintiff filed a cross appeal and claims that the court improperly calculated compensatory damages. Specifically, the plaintiff argues that it suffered a total loss of $461,499.58 due to the defendants' misconduct rather than the $170,646.30, which was awarded. We disagree.

We first set forth our standard of review. "[T]he extent of loss for which an appraiser should be legally responsible is a question of law, subject to plenary review." *Tuthill Finance* v. *Greenlaw*, 61 Conn. App. 1, 6, 762 A.2d 494 (2000). The court based its calculation of compensatory damages on *First Federal Savings & Loan Assn. of Rochester* v. *Charter Appraisal Co.*, 247 Conn. 597, 724 A.2d 497 (1999), concluding that damages in a case of real estate appraiser negligence are determined at the time title vests in the foreclosing party. Pursuant to *First Federal Savings & Loan Assn. of Rochester*, the court concluded that the amount of compensatory damages owed to the plaintiff was the debt owed by Sottile minus the fair market value of the property at the time of foreclosure.

The plaintiff's argument is that the court applied *First Federal Savings & Loan Assn. of Rochester* improperly, thus limiting its damages, and failed to undertake an analysis of duty and proximate cause. We agree that the court failed to undertake an analysis of duty and proximate cause when determining what damages to award, but conclude that the court ultimately awarded

the proper amount of compensatory damages. Our Supreme Court in *First Federal Savings & Loan Assn. of Rochester* did not set out a bright line rule that limited damages in negligent appraisal cases to the previously referenced formula. Rather, our Supreme Court's decision was based on a careful analysis of the duty the defendant owed the plaintiff and damages that were proximately caused from the breach of that duty. We therefore also must undertake an analysis of what duty was owed by the defendants to the plaintiff and what damages were proximately caused by the defendants' breach of that duty.

"The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual. . . . Essential to determining whether a legal duty exists is the fundamental policy of the law that a tortfeasor's responsibility should not extend to the theoretically endless consequences of the wrong. . . . Even where harm was foreseeable, this court has found no duty when the nexus between a defendant's negligence and the particular consequences to the plaintiff was too attenuated." (Citations omitted; internal quotation marks omitted.) Id., 605–606.

Here, we must determine whether the scope of the defendants' duty, in providing a valuation of the property to the plaintiff, extended to protecting the plaintiff against monetary loss that resulted from an indemnification clause in the loan purchase agreement between the plaintiff and Countrywide and a subsequent agreement between the plaintiff and Countrywide in which they resolved and settled a number of outstanding debts owed by the plaintiff to Countrywide. Our starting point in that determination is the purpose for which the appraisal and completion certificate was sought.

The plaintiff had requested an appraisal from the defendants to determine whether the Sottile property would provide adequate security for the $650,000 loan. It also was requested so Countrywide could decide whether to purchase the loan from the plaintiff. There is no indication that the risk the appraisal and completion certificate were intended to protect against was the possibility of Sottile's default on the loan. Rather, the appraisal was intended to ensure that if there was a default, the mortgagee would be secured adequately. The plaintiff claims that the defendants had a duty to protect it from *all* losses that stemmed from the defendants' misconduct. The plaintiff argues that the defendants were responsible for $461,499.58 in damages, which was the amount of money that the plaintiff had agreed to pay Countrywide to resolve several outstanding loans, including but not limited to, the Sottile loan. We do not agree.

The duty owed to the plaintiff was to provide an appraisal on the property to ensure that only the Sottile loan was properly secured in case of a default. The defendants did not have a duty to protect the plaintiff from losses it paid to Countrywide in a subsequent agreement that encompassed several outstanding debts of the plaintiff. Our conclusion is supported by the facts that the defendants did not know of the subsequent agreement between the plaintiff and Countrywide, did not know of the other loans purchased by Countrywide from the plaintiff that were addressed in that agreement, and provided the appraisal and completion certificate only for the Sottile loan. When the defendants issued their negligent and false appraisal and completion certificate, it was foreseeable that the property would be overvalued, causing the loan to be undersecured, and that in case of a default, the plaintiff would suffer loss stemming from that transaction alone. It was not foreseeable that as a result of the plaintiff

repurchasing the Sottile loan from Countrywide that it would enter into an agreement resolving several outstanding loans and be responsible for the money paid in that agreement to resolve those outstanding debts.

We next must determine what damages were proximately caused by the defendants' breach of their duty to the plaintiff. It was foreseeable to the defendant appraiser that providing the false appraisal to the plaintiff would cause it to loan money believing that the property securing the loan was fully constructed when in fact it was not, which would lead to the property's being overvalued and the loan undersecured. As a result, the damages that resulted from the borrower's subsequent default would be proximately caused by the negligent appraisal and completion certificate. Here, the court found that those damages were the debt owed minus the fair market value of the property when the title vested with the plaintiff. The plaintiff, however, argues that the defendants should be responsible for all the money paid to Countrywide. Yet, the evidence demonstrates that the amount the plaintiff paid to Countrywide was due to numerous other outstanding loans and was not related to the negligent appraisal and completion certificate. In other words, the total loss the plaintiff claims was outside the duty owed by the defendants and was not proximately caused by the defendants' conduct.

Although the court did not undertake that analysis of duty and proximate cause, we are "authorized to rely upon alternative grounds supported by the record to sustain a judgment. . . . Where the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it." (Citation omitted; internal quotation marks omitted.) *Kelley* v. *Bonney*, 221 Conn. 549, 592, 606 A.2d 693 (1992). We have determined that the damages claimed by the plaintiff were

not encompassed in the duty the defendants owed, nor were they proximately caused by the breach. Because of that, the only damages available to the plaintiff was the difference between the debt owed on the loan that the appraisal and certificate of completion were prepared for, and the fair market value of the property when title vested with the plaintiff. Accordingly, we conclude that the court properly calculated compensatory damages.

The judgment is affirmed.

In this opinion the other judges concurred.